[L. A. No. 29653. In Bank. Mar. 31, 1970.]

WARNER CONSTRUCTION CORPORATION,
Plaintiff and Respondent, v.
CITY OF LOS ANGELES, Defendant and Appellant.

## Counsel

Roger Arnebergh, City Attorney, Bourke Jones and Charles W. Sullivan, Assistant City Attorneys, and Robert A. Clinco, Deputy City Attorney, for Defendant and Appellant.

Caryl Warner for Plaintiff and Respondent.

## Opinion

**TOBRINER, Acting C. J.**—Plaintiff Warner Construction Corporation brings suit against the City of Los Angeles for breach of warranty and fraudulent concealment in connection with a contract for construction of a retaining wall on Vista Del Mar, a street in the City of Los Angeles. A jury returned a verdict for plaintiff for $150,000. We hold that, since the interpretation of the crucial provisions turned on the credibility of expert testimony, the court did not err in submitting the constructon of the contract to the jury. We have also concluded that the evidence supports the jury's finding of liability. Although certain letters of the city's Board of Public Works, which contained statements tendered in negotiations for a compromise, should not have been admitted, their introduction did not cause prejudicial error. Plaintiff's proven damages, however, reach at most $81,743.55; its failure to present evidence of lost profits renders damages over that sum speculative. The cause, therefore, must be reversed for a new trial on the issue of damages.

Vista Del Mar, a street in the City of Los Angeles, runs parallel to the waterfront along the crest of a hill. The hill is composed of sand and sandstone of varying but low cohesiveness. In 1964 the city requested bids for construction of a retaining wall, referred to as a sidehill bridge, to retard erosion which was undermining Vista Del Mar. In support of the retaining wall, there would be 29 soldier beams, reinforced concrete pillars of 24 to 30 inches in diameter and 18 to 34 feet in legth. Twenty-nine anchor caissons (reinforced concrete pilings) were to be sunk on the other side of Vista Del Mar, and joined to the soldier beams by 2-inch steel rods running under the roadway.

As the low bidder at $81,000, plaintiff obtained the award of the contract. The contract provided for amendment by "change orders" issued by the city at the contractor's request. Five change orders were issued, increasing the contract price to $83,416.53.

During construction, caving occurred in unsupported holes. Plaintiff attempted to drive steel casings into the sand to support the walls of the holes, but due to the instability of the sand the jarring threatened the collapse of the entire work area. Plaintiff then requested a change order to permit drilling with rotary mud,[1] and a concomitant increase in price. The city refused, maintaining that the plans required only that holes be drilled, leaving the drilling method to the contractor's discretion, and thus that no change order was needed. After extended but unsuccessful negotiations, plaintiff resumed construction using rotary mud without a change order, and completed the project.

Plaintiff's suit asserts four causes of action. The first is for the balance of $4,725 plus interest due on the contract; defendant admits this debt. The second cause of action claims damages of $2,716.39 for a five-day delay in construction pending a change order increasing the depth of the wall by 4 feet. This cause of action does not relate in any way to the issues of warranty and concealment, and defendant's briefs on appeal do not discuss it.

This appeal deals solely with plaintiff's third and fourth causes of action, which allege respectively breach of contract and fraudulent concealment of material facts; plaintiff claims damages for the increased cost of construction resulting from the use of rotary mud, for loss of profits, for loss of business, and for loss of an advantageous competitive position in the industry.

Plaintiff bases its third cause of action on Standard Specification No. 158, paragraph 2-8, which provides that if the contractor encounters subsurface conditions materially different from those shown on the plans, which it could not reasonably be expected to ascertain in advance, a change order will issue to provide for any increase in cost resulting from the unexpected conditions. Plaintiff contends that the plans impliedly excluded use of rotary mud, leading it to believe soil conditions permitted casting without rotary mud; it claims a contractual right to a change order compensating for the increased cost of using rotary mud.

Plaintiff's fourth cause of action, for fraudulent concealment, asserts

---

[1]Rotary mud is a drilling fluid. Added to the hole during drilling, it coats the sides of the hole and through hydraulic pressure aids in supporting the walls and preventing cave-ins. A steel casing can then be added for further support; after the use of rotary mud the casing need not be driven into the sand but drops of its own weight.

that the city did not disclose that cave-ins occurred in both test holes drilled by the city, forcing the city to change its drilling methods and to abandon the holes before reaching the planned depth of 50 feet. Plaintiff also claims that the city concealed information that two ancient landslides occurred at the construction site.

### 1. *The issue of liability*

We consider the issue of liability in three parts: (a) the logs of the test holes; (b) General Notes 7 and 8; and (c) the nondisclosures.

### (a) *The logs of the test holes*

The plans and specifications included the logs of two test holes. The logs show that the city drilled two test holes on the site, which passed through various layers of sand. Undisputed evidence, however, demonstrated that the log of test hole No. 1 erroneously reported the soil to a depth of 14 feet as "coarse sand with clay binder" although the material actually discovered was "coarse sand with minute binder." Likewise, the log of test hole No. 2 listed 26 to 35 feet as "sand with clay binder" although the material actually encountered at that depth was "sand with minute binder." Mr. Maurseth, a soil mechanics engineer, testified that "clay binder" meant, in the trade, a sufficient amount of clay to cause the sand particles to adhere cohesively; "minute binder" meant the binding material is present in such minute quantities that it is inadequate to stabilize the sand. Being less cohesive, "sand with minute binder" is much more likely to cave in.

We do not accept defendant's contention that the trial court erred in submitting the interpretation of the logs to the jury. Although defendant urges that under *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], "it is . . . a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence," the interpretation of the contract here depends on the credibility of Mr. Maurseth's testimony that "sand with clay binder" implies not a "minute" amount of clay, but an amount sufficient to give significant stability to the formation. The trial court properly relegated that question of credibility for decision by the jury. (See *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 294 [74 Cal.Rptr. 521, 449 P.2d 737].)

Attached to the test-hole logs was a caveat: "The test-hole information on these plans shows conditions found only at the date and location indicated. Bidders are cautioned that the city in no way warrants that such information is representative of conditions at any other location,

or at any other time. Groundwater levels, particularly, are subject to change."

Although defendant contends that this note effectively disclaims any warranty, we find, on closer examination, that the warranty and the disclaimer pass each other without collision. The warranty describes the subsurface conditions at the test holes, but says nothing about conditions elsewhere on the site. The disclaimer states that "the test-hole information . . . shows conditions found only at the date and location indicated," and cautions bidders that the city does not warrant that the data is representative of other locations, but it in no way disclaims the accuracy of the test-hole logs.[2] Reading the two together, we conclude that the bidder takes the risk in making deductions from accurate test data, but the city retains responsibility for any inaccuracy in the data. (See *Wunderlich* v. *State of California* (1967) 65 Cal.2d 777, 784-785 [56 Cal.Rptr. 473, 423 P.2d 545]; *Chris Nelsen & Son, Inc.* v. *City of Monroe* (1953) 337 Mich. 438, 446 [60 N.W.2d 182].)

 Whether the misrepresentation of "clay binder" for "minute binder" was a material misrepresentation, whether plaintiff relied on it, and whether that reliance was reasonable, all present disputed questions

---

[2]Standard Specification No. 158, section 2-1, contains another disclaimer, which is not discussed by the parties on appeal. This disclaimer reads: "While it is believed that information obtained by the Engineer will be reasonably correct, the City does not warrant either the completeness or the accuracy of such information. It is the responsibility of the Contractor to ascertain the existence of such additional conditions affecting his cost of doing the work as may be disclosed by a reasonable examination of the site."

In *E. H. Morrill Co.* v. *State of California* (1967) 65 Cal.2d 787 [56 Cal.Rptr. 479, 423 P.2d 551], we held that the trial court erred in construing a very similar provision to be an effective disclaimer of specific representations of site conditions. We there noted the specific character of the representations of site conditions and of geological conditions; we emphasized the absence of any cross-reference from the representations to the general language of the disclaimer. We then quoted from *Hollerbach* v. *United States* (1914) 233 U.S. 165, 172 [58 L.Ed. 898, 901, 34 S.Ct. 553]: "It 'would be going quite too far to interpret the general language of the other [sections of the contract] as requiring independent investigation of facts which the specifications furnished by the government as a basis of the contract left in no doubt. . . . In its positive assertion of the nature of this much of the work [the government] made a representation upon which the claimants had a right to rely without an investigation to prove its falsity.' " (P. 792.)

The trial court in the instant case read the section 158 disclaimer to the jury, but instructed them that "if a public agency makes a positive and material representation as to a condition presumably within the knowledge of the agency and upon which the plaintiff had a right to rely, the agency is deemed to have warranted such facts despite a general provision requiring an on-site inspection by the contractor." In submitting the issue of the effect of the section 158 disclaimer to the jury, and its instructions to the jury, the trial court complied with our decision in *Morrill,* and the verdict must be taken as resolving that issue against defendant.

of fact properly submitted to the jury. The jury's verdict impliedly resolved these issues in plaintiff's favor.

(b) *General Notes 7 and 8*

■ The plans and specifications contained 16 "General Notes." Note 7 provides that "holes for the soldier beams and anchor caissons shall be made by boring and/or drilling." Note 8 states: "soldier beams and anchor caissons shall be cast in place within unsupported holes, except that where, in the opinion of the engineer, the holes are subject to caving or sloughing, or are in any way unstable, the walls shall be temporarily supported by steel casings or shells. Before placing the steel casing or shells as much of the loose soil as is practical shall be removed from the holes."

Defendant contends that the language of Notes 7 and 8 does not prohibit the use of rotary mud, but leaves the drilling technique entirely to the contractor's discretion. The rotary mud technique, however, is an unusual and expensive method of drilling, and results in castings of less strength than casting against virgin soil.[3] Plaintiff adduced substantial expert testimony, including not only plaintiff's experts but also Mr. Reader, the city's engineer in charge of designing the sidehill bridge, to the effect that the specifications of General Note 8 impliedly excluded the use of rotary mud and that a change order would be required to permit rotary mud drilling.

In *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641], we held that the "test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." Under that test plaintiff's evidence that General Notes 7 and 8 excluded use of rotary mud was properly admitted, and the interpretation of the General Notes in the light of that evidence posed a question for the jury.

(c) *The non-disclosure: the alleged fraudulent concealment*

A fraudulent concealment often composes the basis for an action in tort, but tort actions for misrepresentation against public agencies are barred

---

[3]General Note 8 contemplated casting the concrete against virgin soil; steel casings, if utilized, were only to furnish "temporary" support and to be withdrawn before casting. If rotary mud were used, it would coat the sides of the hole and the concrete would be cast against a thin layer of rotary mud. The resulting structure has somewhat less strength since slight lateral movement is possible before the concrete meets the resistance of the soil.

by Government Code section 818.8.[4] Plaintiff retains, however, a cause of action in contract. ■ "It is the general rule that by failing to impart its knowledge of difficulties to be encountered in a project, the owner will be liable for misrepresentation if the contractor is unable to perform according to the contract provisions." (*City of Salinas* v. *Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 222 [57 Cal.Rptr. 337, 424 P.2d 921] (disapproved on other grounds in *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 14 [84 Cal.Rptr. 173, 465 P.2d 61]).) As explained in *Souza & McCue Construction Co.* v. *Superior Court* (1962) 57 Cal.2d 508, 510-511 [20 Cal.Rptr. 634, 370 P.2d 338]: "This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness. The fact that a breach is fraudulent does not make the rule inapplicable." (See also *E. H. Morrill Co.* v. *State of California, supra,* 65 Cal.2d 787, 793-794; *John McShain, Inc.* v. *United States* (Ct. Cl. 1969) 412 F.2d 1281.)

In transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead;[5] (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff;[6] (3) the defendant actively conceals discovery from the plaintiff.[7]

■ All these instances are present in this case, or so the jury could find. The nondisclosure of the cave-ins and special drilling techniques used in drilling the test holes transformed the logs into misleading half-truths.

---

[4]Section 818.8 states that "[a] public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional." Section 814 provides that nothing in the Tort Claims Act "affects liability based on contract." Interpreting these provisions, we held in *E. H. Morrill Co.* v. *State of California, supra,* 65 Cal.2d 787, 793-794, that section 818.8 barred a tort action for deceit against a public entity, but did not affect an action in contract for breach of warranty.

[5]Civil Code section 1710, subdivision 3; *Rogers* v. *Warden* (1942) 20 Cal.2d 286, 289 [125 P.2d 7]; *McCue* v. *Bruce Enterprises, Inc.* (1964) 228 Cal.App.2d 21. 27 [39 Cal.Rptr. 125]; *Gillespie* v. *Ormsby* (1959) 126 Cal.App.2d 513, 527 [272 P.2d 949].

[6]*Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 735 [29 Cal.Rptr. 201, 8 A.L.R.3d 537]; *Sime* v. *Malouf* (1949) 95 Cal.App.2d 82, 100 [212 P.2d 946, 213 P.2d 788]. *Barder* v. *McClung* (1949) 93 Cal.App.2d 692, 697 [209 P.2d 808].

[7]*Herzog* v. *Capital Co.* (1945) 27 Cal.2d 349, 353 [164 P.2d 8]; *Sime* v. *Malouf, supra,* 95 Cal.App.2d 82, 99; *Williams* v. *Graham* (1948) 83 Cal.App.2d 649, 652 [189 P.2d 324].

The facts concealed were exclusively available to defendant. Finally, plaintiff presented evidence of intentional concealment by the city.[8]

## 2. *Completion of Performance*

The city argues that, since the contract did not expressly authorize use of rotary mud, plaintiff, in performing in that manner, attempted to force the city to reform the contract and to subvert the policy requirement of competitive bidding. It contends that modifications of a contract can only be awarded through competitive bidding (*Paterson* v. *Board of Trustees* (1958) 157 Cal.App.2d 811 [321 P.2d 825]), and that, absent modification, plaintiff's only remedies lie in either prompt rescission of the contract or discontinuance of performance and suit for damages (see *Kenworthy* v. *State of California* (1965) 236 Cal.App.2d 378 [46 Cal.Rptr. 396]).

As the court in *Gogo* v. *Los Angeles etc. Flood Control Dist.* (1941) 45 Cal.App.2d 334, 338 [114 P.2d 65], stated, however, "[a] party induced by a false representation to enter into a contract may proceed to perform it and sue for damages for the misrepresentation." Evidence in the instant case showed that plaintiff's abandonment of the project would have created a serious public hazard. The bank on the downhill side of the roadway had been cut sheer and solidified by a chemical process. The chemical solidification, however, effected only a temporary control; a halt in construction pending a suit for rescission or damages, or pending further competitive bids, would have risked the collapse of the road and the sliding of the structure onto the street below. Under the circumstances, plaintiff justifiably completed construction; defendant has not questioned the reasonableness of the methods used, nor the cost incurred, in the completion.

Defendant stands on somewhat stronger ground when it alleges that, in view of the situation, plaintiff delayed too long before resuming work. Section 2-8 of the Standard Specifications, however, contemplates that the contractor will halt performance pending issuance of a change order, and the reasonableness of plaintiff's delay and its resulting claim for damages raised questions for the jury.

[8]The general disclaimer in Standard Specification No. 158 does not affect plaintiff's action for fraudulent concealment. (*City of Salinas* v. *Souza & McCue Construction Co., supra,* 66 Cal.2d 217, 224; *A. Teichert & Son, Inc.* v. *State of California* (1965) 238 Cal.App.2d 736, 755 [48 Cal.Rptr. 225]. The latter case was disapproved on other grounds in *E. H. Morrill Co.* v. *State of California, supra,* 65 Cal.2d at p. 792, but remains viable authority on the point in question.)

### 3. Admission of Evidence

On February 23 and 24, 1965, plaintiff notified defendant of its unwillingness to continue work without a change order. On March 8 defendant sent plaintiff a report of the Board of Public Works stating that "consideration of alternate methods of constructing the project is not thought to be necessary," and directing plaintiff to resume work.

On March 19 plaintiff sent another request, which suggested that rotary mud be used at an additional cost to the city of $12,000. The president of the Board of Public Works, Mr. Gill, sent plaintiff a letter on March 25 authorizing use of rotary mud and stating that the city would assume the additional cost. On March 29 the secretary to the board confirmed this communication, stating that the city engineer would issue an appropriate change order. In the meantime, however, plaintiff discovered that the additional work would cost not $12,000 as previously estimated, but $34,400, and it so notified the city. As a result of this communication the defendant did not issue the change order at $12,000; it rejected plaintiff's $34,400 offer.

The trial court, over defendant's objection, admitted into evidence the letter from Mr. Gill authorizing use of rotary mud and stating that the city would assume the additional cost, and the letter from the secretary of the board confirming the president's letter. Plaintiff offered these exhibits generally, without specifying any basis for their admission. Defendant objected on several grounds, including Evidence Code section 1152, which provides in part: "Evidence that a person has, in compromise . . . , furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his liability for the loss or damage or any part of it."

We cannot accept plaintiff's contention that the correspondence could properly have been admitted to show the contemporaneous and practical construction of the contract. We recognize, however, that the court could properly have admitted the evidence for the limited purpose of proving plaintiff's bona fide and good faith efforts to reach an agreement so that work could be resumed. But the court imposed no such limitation, and we find no basis to hold that defendant waived the point. We finally conclude, however, that, despite the error in admission of the evidence, no prejudice to defendant resulted.

The principle of "practical construction" applies only to acts performed under the contract before any dispute has arisen. The "construction

given the contract by the acts and conduct of the parties with knowledge of its terms, *before any controversy has arisen as to its meaning,* is entitled to great weight and will, when reasonable, be adopted and enforced by the court." (Italics added.) (*Woodbine* v. *Van Horn* (1946) 29 Cal.2d 95, 104 [173 P.2d 17].)[9] By March 8, 1965, the parties had reached a stage of clear disagreement on the crucial question whether plaintiff was entitled to a change order. Anything said in negotiations after that date could not be admitted under the rule of practical construction; it remained subject to exclusion under Evidence Code section 1152.[10]

Plaintiff argues that since the contract provides for its own modification by change orders, a dispute should not be said to arise until the parties have abandoned efforts to resolve the controversy within this contractual framework. Although the instant agreement does include an amendatory procedure, all contracts can be amended by consent of the parties; a compromise in a contract dispute, even if reached at the courthouse steps, will often take the form of a modification of the contract. We see no valid grounds for distinction between contracts which contemplate amendment and those which do not.[11] The purpose of section 1152, to promote candor in settlement negotiation (see Evid. Code, § 1152, Law Revision Com. com.), applies equally in both instances.

We have stated that we believe that the correspondence between the parties could have been admitted to show that during the delay of March 1965 plaintiff, in good faith and pursuant to the contractual procedure, had engaged in negotiations in the reasonable hope that an agreement could be reached and the work resumed.[12] Admission of proof of negotiations for this narrow purpose would not be likely to discourage negotiations; on the other hand, the exclusion of such evidence, after defendant has put in issue the reasonableness of plaintiff's delay of performance,

[9]Accord: *Whalen* v. *Ruiz* (1953) 40 Cal.2d 294, 301 [253 P.2d 457]; *Gillespie* v. *City of Los Angeles* (1950) 36 Cal.2d 553, 561 [225 P.2d 522].

[10]Plaintiff cites *California Home Extension Assn.* v. *Hilborn* (1951) 37 Cal.2d 459, 465 [235 P.2d 369], which stated "Although the statements were allegedly made during a conference at which the parties were attempting to compromise their difficulties, that fact does not justify exclusion of the evidence if it was otherwise admissible." Evidence Code section 1152, however, expressly excludes not only offers of compromise but also "any conduct or statements made in negotiation thereof."

[11]The only authority we have found which bears even remotely on the point, Jones, *Evidentiary Concepts in Labor Arbitration: Some Modern Variations on Ancient Legal Themes* (1966) 13 U.C.L.A. L.Rev. 1241, 1278-1279, discusses the exclusion in labor arbitrations of evidence of offers of compromise arising during the contractual grievance procedure.

[12]Evidence of the negotiations might also be admissible to rebut defendant's claim that plaintiff failed to mitigate damages (see *supra,* at p. 295); if defendant had raised any issue respecting plaintiff's exhaustion of contractual remedies the evidence of negotiations would clearly be admissible to prove exhaustion.

would arbitrarily limit its rebuttal. Plaintiff then argues that "if evidence is admissible for any .purpose, it must be received, even though it may be highly improper for another purpose" (*Inyo Chemical Co. v. City of Los Angeles* (1939) 5 Cal.2d 525, 544 [55 P.2d 850]) and that defendant's sole remedy is to seek a limiting instruction (see Evid. Code, § 355).[13] Since defendant requested no such instruction, plaintiff contends that it waived any error.

In the instant situation, however, defendant's opportunity to seek a limiting instruction did not constitute a sufficient remedy. (See *Adkins v. Brett* (1920) 184 Cal. 252, 258-259 [193 P. 251]; *Brown v. Affonso* (1959) 185 Cal.App.2d 235, 239 [8 Cal.Rptr. 156].) The evidence was offered generally; when defendant objected, plaintiff's counsel defended the offer primarily on the ground that the correspondence showed the actions of the parties under the contract.[14] The trial court admitted the evidence without any hint of limited purpose, and to all appearances the trial judge had rejected defendant's contention that the correspondence constituted negotiations of compromise under section 1152. Under these circumstances defense counsel cannot be expected to speculate upon the possibility that the court received the evidence for some undisclosed and limited purpose other than that suggested by its proponent, or to prepare instructions based on any such speculation.[15] "A trial becomes unfair if

---

[13]See *Daggett v. Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 665 [313 P.2d 557] (purpose of evidence not specified; objection, for lack of materiality, may have been based on wrong grounds); *Hatfield v. Levy Brothers* (1941) 18 Cal.2d 798, 809-810 [117 P.2d 841] (evidence offered generally; motion to strike based on incorrect grounds); *Brown v. Affonso* (1959) 185 Cal.App.2d 235, 239 [8 Cal.Rptr. 156] (evidence offered for proper purpose).

[14]Evidence Code section 354 states in part that "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless . . . it appears of record that (a) the substance, purpose, and relevance of the excluded evidence was made known to the court . . . ." Thus when evidence is offered on an inadmissible basis, its exclusion is not reversible error. (Witkin, Cal. Evidence (2d ed. 1966) p. 280.) The court may, of course, admit the evidence despite the mistaken theory of its proponent, but in such event fairness may require that the court disclose the limited purpose for which it is admitting the evidence. (*Shepard v. United States* (1933) 290 U.S. 96, 102-103 [78 L.Ed. 196, 200-201, 54 S.Ct. 22].)

[15]*Martinez v. Nichols Conveyor etc. Co.* (1966) 243 Cal.App.2d 795, 802 [52 .Cal.Rptr. 842], and *Southers v. Savage* (1961) 191 Cal.App.2d 100, 105 [12 Cal.Rptr. 470], both stated that "[i]f evidence is admissible on any ground, even through such ground is not specified, either intentionally or unintentionally, by the trial court, this court . . .. will not find error in its admission." This doctrine traces to *Wilcox v. Berry* (1948) 32 Cal.2d 189, 192 [195 P.2d 414]. In that case the trial court admitted Mr. Berry's statement that his car's brakes did not work properly as a spontaneous declaration; we held that it was admissible as an admission against interest, so that "the ground of the court's ruling is immaterial."

When evidence is admissible generally, as in *Wilcox* and *Southers,* the theory under which it was admitted is immaterial; the evidence comes before the court properly

testimony thus accepted may be used in an appellate court as though admitted for a different purpose, unavowed and unsuspected. . . . Such at all events is the result when the purpose in reserve is so obscure and artificial that it would be unlikely to occur to the minds of uninstructed jurors, and even if it did, would be swallowed up and lost in the one that was disclosed." (*Shepard* v. *United States* (1933) 290 U.S. 96, 103 [78 L.Ed. 196, 201 54 S.Ct. 22].)[16]

Furthermore, by the time of the submission of the jury instructions, a significant part of the trial testimony had been devoted to a discussion of the meaning and import of these exhibits. At this point a request for a limiting instruction would have been doubly futile; not only had the court apparently rejected the contention of the defense that the letters were offers of compromise under section 1152, but so much testimony had pertained to the letters that the jury could not reasonably be expected to follow any such instruction.

We have concluded, however, that the error did not cause prejudice to defendant. Plaintiff's third cause of action alleged that plaintiff was entitled to a change order to permit use of rotary mud; the exhibits in question are the most convincing evidence presented on this question and their admission was plainly prejudicial so far as this cause of action is concerned.[17] Plaintiff's fourth cause of action, however, was

---

and without restriction on its use. The situation is quite different when, as in the present case, evidence is admitted generally which should have been admitted only for a very limited purpose; in such instances the theory of admission is crucial. *Martinez* v. *Nichols Conveyor etc. Co., supra,* 243 Cal.App.2d 795, failed to recognize this distinction. Its application of the *Wilcox* rationale to evidence admissible only for a limited purpose appears erroneous.

[16]In *Shepard* v. *United States, supra,* 290 U.S. 96, the evidence was offered expressly on an improper ground, and the court commented that "a different situation would be here if we could fairly say in the light of the whole record that the purpose had been left at large, without identifying token. There would then be room for argument that demand should have been made for an explanatory ruling." (P. 103 [78 L.Ed. p. 201].) Although in the present case plaintiff's counsel offered the evidence without specifying the ground for admission, he provided an "identifying token"; plaintiff's counsel defended the offer on the ground that it was admissible to show the practical construction of the contract, and used the evidence for that purpose during the trial.

[17]After the court had admitted the exhibits into evidence, defendant called Mr. Gill to explain his action and the action of the Board of Public Works respecting the proposed change order. At various times during trial, other witnesses referred to the exhibits without objection. Plaintiff contends that this testimony constitutes a waiver by defendant of its objection to admission of the exhibits, or, alternatively, that it makes any error in their admission non-prejudicial since the content of the documents was substantially repeated before the jury in the oral testimony.

The principle stated in *Fernandez* v. *Western Fuse etc. Co.* (1917) 34 Cal.App. 420, 424 [167 P. 900], answers this argument: "The error was committed at the instance of the opposite party, and appellant did all it could to prevent the

for fraudulent concealment, and the correspondence is immaterial to this cause of action.[18]

Plaintiff's evidence of error in the test-hole logs and of concealment of material data was largely undisputed and, as pointed out *supra* at pages 291-293, defendant's disclaimers under such circumstances cannot stand. The only major issue of fact that remains is whether plaintiff relied on the city's data. Plaintiff's president testified that he did so; expert testimony showed that such reliance was reasonable. Defendant points out that plaintiff dug its own test-holes, but such holes were intended only to confirm surface conditions and did not go to a depth sufficient to disclose the subsurface conditions misrepresented or concealed by defendant.[19]

We conclude that it is not reasonably probable that, absent the erroneous admission of the exhibits, defendant would have attained a more favorable result (see *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]). To the contrary, even if the jury had found for defendant on the third cause of action the probability is that the jury would have returned a verdict for plaintiff based upon proof of fraudulent concealment under plaintiff's fourth cause of action.

### 4. *Damages*

■■ Defendant asserts that the $150,000 damages awarded plaintiff includes compensation for speculative and unproven items of damages.

---

error. After the court had held over appellant's objection that the evidence was competent . . . appellant, in seeking to overcome the case made by the appellee, could follow the theory laid down by the court without impliedly admitting the court's theory to be right, and without waiving his right to question the court's action." (See also *De Roulet* v. *Mitchel* (1945) 70 Cal.App.2d 120, 125 [160 P.2d 574].)

[18]The jury rendered a general verdict against defendant, and some cases hold that "even though the evidence may not be sufficient to sustain a cause of action . . . a reversal may not be had upon that ground if the evidence as to other causes of action . . . is sufficient to sustain the verdict." (*Caccamo* v. *Swanston* (1949) 94 Cal. App.2d 957, 971-972 [212 P.2d 246]; see, e.g., *Philpott* v. *Mitchell* (1963) 219 Cal. App.2d 244, 255-256 [32 Cal.Rptr. 911]; *Guerra* v. *Balestrieri* (1954) 127 Cal. App.2d 511, 517 [274 P.2d 443]; *Martin* v. *Vierra* (1939) 34 Cal.App.2d 86, 94 [93 P.2d 261].) Other cases, however, warn that "[w]here it seems probable that the jury's verdict may have been based [on error] prejudice appears and this court 'should not speculate upon the basis of the verdict.' " (*Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929]; *Oettinger* v. *Stewart* (1944) 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221].) Neither formula permits us to shortcut our constitutional duty to examine the entire record to determine whether the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.)

[19]Defendant also notes that Mr. Warner testified that "my procedure would have been about the same" if the plans had contained no test-hole information. Subsequent testimony by Warner indicated that "procedure" referred to the construction method, and that Warner relied on the data both in computing its bid and in not undertaking further independent investigation of subsoil conditions.

Although plaintiff undoubtedly should recover the additional cost of construction attributable to the city's misrepresentations, plus a reasonable profit on the additional work (see *City of Salinas* v. *Souza & McCue Construction Co., supra,* 66 Cal.2d 217, 225), its verified claim specified an itemized additional cost of $73,672.16.[20] This figure included $200 a day for personal supervision by James Warner, plaintiff's president. Since Warner is virtually sole owner of plaintiff, and since Gerald Stephenson, plaintiff's certified public accountant, referred to the $200 per day as profit and supervision, plaintiff's claim of $73,672.16 must include a reasonable profit. Defendant concedes that a balance of $4,725 is owing on the original contract; as this balance is a sum certain we add interest in the amount of $630, making a total of $5,355. Defendant also does not challenge on appeal plaintiff's claim for $2,716.39 on its second cause of action.

The above items of damage total $81,743.55, which, deducted from the verdict of $150,000, leaves a balance of $68,256.45. According to plaintiff, this sum would do no more than compensate it for further losses. Warner testified that plaintiff was compelled to bear the additional cost of construction out of its own resources. This loss of capital, according to Warner, forced a curtailment in construction operations and in research; the loss likewise led to a reduction of bonding capacity as well as the destruction of plaintiff's former advantageous competitive position in the industry.

For an established firm such as Warner Construction Corporation, an award for lost profits could not be criticized as speculative. (See *Lucky Auto Supply* v. *Turner* (1966) 244 Cal.App.2d 872, 882 [53 Cal.Rptr. 628].) Plaintiff, however, presented no evidence to show the loss of profits resulting from this alleged impairment of capital. Loss of business, restriction of research, reduction of bonding capacity, and destruction of a former advantageous competitive position comprise imponderable factors which may affect different companies to differing extents and amounts. Measurement of the damages requires proof of the effect of these factors upon the profits of plaintiff. (*Dallman Co.* v. *Southern Heater Co.* (1968) 262 Cal.App.2d 582, 591-592 [68 Cal.Rptr. 873].) In the absence of such proof, the damages in excess of $81,743.55 are speculative and cannot be sustained.

---

[20]Plaintiff asserts that Warner estimated the original cost of the job at $72,000, and that the final cost was $156,349.53, making an additional cost due to the city's misrepresentations of $84,349.53. This computation is erroneous. The $72,000 does not include the additions resulting from the five change orders, and includes no sum for lost profits; the $156,349.53 figure takes account of the change orders and includes the estimated profit on the contract, but no claim for a reasonable profit on the additional work necessitated by use of rotary mud.

In *Stott* v. *Johnston* (1951) 36 Cal.2d 864, 876 [229 P.2d 348, 28 A.L.R.2d 580], we upheld an award of $10,000 for damages to good will, stating that "[u]nder all the circumstances here, it is difficult to see what additional evidence plaintiff could have introduced on the damage issue. The law only requires that the best evidence be adduced of which the nature of the case is capable."[21] Plaintiff has not presented the "best evidence" available. It did not present evidence of its profits for the years preceding or following 1965; it presented no expert analysis or breakdown of the damages. The damages attributed by plaintiff to loss of capital amount to an annual return of over 30 percent on the capital; plaintiff presented no evidence that its business achieved such a rate of return on invested capital. In sum, although plaintiff undoubtedly sustained damage from the loss of capital, the amount of damage is entirely uncertain, and we cannot believe that plaintiff has brought forth the best evidence of which the case is capable.

Plaintiff contends that defendant waived its right to object to the award. Plaintiff stresses the following points: defendant's failure to demur to the allegations of damages in the complaint, defendant's emphasis in its argument to the jury upon the issue of liability, its omission of any discussion of the amount of damages, and the absence of any objection to the instructions on damages. Defendant, however, has never conceded that plaintiff was entitled to damages in excess of the $4,725 owing on the contract; nor did the instructions compel or permit the jury to award speculative damages. Defendant's tactical decision to emphasize the liability issue and minimize discussion of damages does not, in our opinion, amount to a waiver of defendant's right to object on appeal to speculative damages.

### 5. *Misconduct by Plaintiff's Counsel*

In arguing to the jury plaintiff's counsel repeatedly referred to the city's public works budget of $60,000,000 a year.[22] Defendant asserts that

---

[21]See *Steelduct Co.* v. *Henger-Seltzer Co.* (1945) 26 Cal.2d 634, 651 [160 P.2d 804]; *Dallman* v. *Southern Heater Co., supra,* 262 Cal.App.2d 582, 594; *Allen* v. *Gardner* (1954) 126 Cal.App.2d 335, 340 [272 P.2d 99]; *Rilovich* v. *Raymond* (1937) 20 Cal.App.2d 630, 644 [67 P.2d 1062]; *Hacker etc. Co.* v. *Chapman V. Mfg. Co.* (1936) 17 Cal.App.2d 265, 267 [61 P.2d 944]. McCormick, Damages (1935), states that: "In deciding questions of certainty of proof, there seems to be a clearly discernible tendency to treat the problems more and more individually and pragmatically, and not only to insist that *the claimant furnish the best available proof of the amount of loss,* but also to hold that, if he has furnished the most satisfactory data that the particular situation admits of, this suffices." (Italics added.) (P. 110.)

[22]Examples of such references are:

"$184,000 isn't very much as against $60,000,000. On the other hand, it's a tidy sum of money. . . . It's what the damages are fairly shown by the evidence . . . you will find it's the cost of doing business."

these references constitute an impermissible appeal to base damages on the wealth of defendant and to take into account the relative poverty of plaintiff. (See *Love* v. *Wolf* (1964) 226 Cal.App.2d 378, 388-389 [38 Cal.Rptr. 183].)

During plaintiff's argument to the jury defense counsel did not object or request that the jury be admonished; instead, he waited until the conclusion of the arguments and then moved for a mistrial. In *Horn* v. *Atchison T. & S. F. Ry. Co.* (1961) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561], we stated: "Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. . . . In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice. The motion for a mistrial in the instant case can hardly be deemed a timely objection as the claimed damage could not then be forestalled."[23]

To the extent that it awards damages in excess of $81,743.55, the judgment is reversed and the cause remanded for further proceedings in accord with the views herein expressed; in all other respects the judgment is affirmed. The parties shall bear their own costs on appeal.

McComb, J., Peters, J., Mosk, J., Sullivan, J., and Coughlin, J.,* concurred.

---

"Who should stand the loss between the contractor with that character and that determination and that purpose in life and that belief in the truth or should a great wealthy municipal corporation spending $60,000,000 a year for such things who have conducted themselves as you have seen in this case?"

"Of course, $100,000 is only peanuts on this operation. You heard Mr. Gill testify that he is spending some $60,000,000 a year. Another witness said they had some $3,000,000 in the capital improvement fund. That isn't the test how much a person has. The test is what was the damage."

"Are we going to say the king can do no wrong and Mr. Warner stands the $184,000, his family, his corporation—can it stand that loss or does it come out of the $60,000,000 a year that Mr. Gill is spending. I think there's a strong moral here. I think that a government has to be honest with its subjects. There must be a truthfulness, a certain faith, a certain integrity between the city and the individual because if the city is dishonest then what can we tell our children?"

[23]Unlike *Horn*, counsel did request that the jury be admonished to disregard the alleged improper statements. Defendant submitted an instruction, stating as it did so its belief that the instruction would not cure the prejudicial effect of the misconduct. The court refused the instruction on the ground that instructions against verdicts based on passion or prejudice, and prohibiting punitive damages, were sufficient.

*Assigned by the Chairman of the Judicial Council.