FILED
04/16/2024
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### October 3, 2023 Session

## CHSPSC, LLC v. THE CALIFORNIA CREDITS GROUP, LLC

**Appeal from the Chancery Court for Williamson County**
**No. 20CV-49329B      Michael Binkley, Chancellor**

_____

### No. M2023-00040-COA-R3-CV

_____

A tax group performed tax credit services on a contingency fee basis for a corporation that owned several hospitals in California. Four and half years after the corporation completed a transaction referred to as a "spinoff," the tax group informed the corporation that the spinoff triggered a reorganization provision of the parties' contract that entitled the tax group to a fee for unused tax credits related to one of the hospitals involved in the spinoff. The corporation filed suit requesting a declaratory judgment that no fee was owed because the spinoff did not trigger the contract's reorganization provision. After conducting discovery, the parties filed cross motions for summary judgment. The trial court denied the tax group's motion and granted summary judgment to the corporation after concluding that the parties' conduct prior to the dispute showed that they intended the term "reorganization" to have a tax-based meaning that corresponded to the Internal Revenue Code's definition of the term and that the spinoff did not constitute a reorganization under that definition. Discerning no error, we affirm the trial court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the Court, in which ARNOLD B. GOLDIN and JEFFREY USMAN, JJ., joined.

Nancy Vincent, Nashville, Tennessee, for the appellant, The California Credits Group.

David Andrew Curtis and John R. Jacobson, Nashville, Tennessee, for the appellee, CHSPSC, LLC.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

Community Health Systems Professional Services Corporation, LLC ("CHSPSC") provides consulting services to hospitals that are owned by direct and remote subsidiaries of CHSPSC's indirect parent entity, Community Health Systems, Inc. ("CHSI"). The California Credits Group ("CCG") provides tax credit services with a primary focus on identifying California Enterprise Zone tax credits.[1] On June 17, 2009, CHSPSC and CCG entered into a contract whereby CCG would identify certain tax credits available to CHSPSC under California law in exchange for CHSPSC paying CCG a fee equal to twenty-five percent of any credits and interest resulting from identified tax credits utilized by CHSPSC. In other words, the contract stated that CCG would work on a contingency fee basis because it was not entitled to payment unless CHSPSC utilized the identified credits.

Section xii of the contract provides one limited exception to CCG's agreement to work on a contingency fee basis. That section states as follows:

> **Reorganization** — Any reorganization by [CHSPSC] that results in the suspension or elimination of Credits identified by [CCG] will be treated as being utilized by [CHSPSC] at such time or reorganization.

Thus, two conditions must be satisfied to trigger this exception: (1) there must be a "reorganization" by CHSPSC, and (2) that reorganization must result in the "suspension[2] or elimination" of credits CCG identified. The contract does not define the terms "reorganization" or "elimination."

After entering into the contract, CCG identified approximately $898,125 in tax credits generated by the business activities of one of CHSI's subsidiaries, Watsonville Hospital Corporation ("Watsonville"), between 2000 and 2012. Watsonville utilized approximately $685,481 of those tax credits through the 2013 tax year, and CCG received a twenty-five percent contingency fee totaling $171,370. The parties' dispute centers on Watsonville's unused tax credits.

On April 29, 2016, CHSI completed a transaction the parties refer to as "the spinoff." In the spinoff, CHSI distributed to its public shareholders the stock of a subsidiary, Quorum Health Corporation ("Quorum"). Quorum was an indirect parent

---

[1] The record contains little explanation regarding the nature of these tax credits, but the parties' contract indicates that they are "hiring credits and equipment based credits" that businesses may acquire under California law.

[2] Neither party contends that a "suspension" of tax credits occurred in this case.

entity of Watsonville, and it continued to indirectly own Watsonville after the spinoff. After the spinoff, however, Watsonville was no longer a part of CHSI's and its subsidiaries' unitary tax group for income tax purposes under California law. Instead, Watsonville was then part of Quorum's unitary tax group.

The spinoff was structured in a way as to be tax free by not meeting the definition of "reorganization" under the Internal Revenue Code. Section 355 of the Internal Revenue Code governs the distribution of stock and securities of a controlled corporation and expressly states that no gain or loss shall be recognized on such a distribution so long as the distribution is not part of a "reorganization." 26 U.S.C. § 355(c)(1). Section 368 of the Internal Revenue Code sets out seven transactions that constitute a "reorganization." 26 U.S.C. § 368. Transactions falling within the definition of "reorganization" include a statutory merger, recapitalization, change in place of organization or corporate form, or transfer by a corporation of its assets to another corporation in bankruptcy under certain circumstances. None of the seven transactions meeting the definition of "reorganization" describes the spinoff.

Seven months before the spinoff occurred, Chad Courtright, Senior Manager of Tax Controversy at CHSPSC, sent an email to Aaron Valle, Project Coordinator at CCG, to inform CCG that Watsonville would be spun off. In the email, Mr. Courtright asked what impact, if any, the spinoff would have on Watsonville's unused tax credits. Mr. Valle responded, "Regarding what happens to the credits, they'll be spun out with Watsonville. It's actually an issue we see fairly often." Following the spinoff, the credits did, in fact, spinoff with Watsonville and continued to exist. For the next four years, CCG communicated with Quorum about the credits and made no claim to CHSPSC that the spinoff triggered the contract's reorganization provision.

In February 2020, when it became apparent that Quorum was unlikely to be able to use Watsonville's unused tax credits before they expired, CCG, for the first time, suggested to CHSPSC that there "may be" some fee implications due to the spinoff after all. Thereafter, CCG began referring to the spinoff as a "reorg" and claiming that the spinoff resulted in the "elimination" of Watsonville's unused tax credits because CHSI's unitary tax group had been "dispossessed of the Credits." On April 2, 2020, CCG sent CHSPSC a letter claiming that CCG had "recently discovered" that Watsonville "spun off from [CHSI] on April 29, 2016." The letter went on to inform CHSPSC that the spinoff constituted a "reorganization" that resulted in the elimination of the tax credits, entitling CCG to payment of its twenty-five percent contingency fee under Section xii of the contract. Thus, CCG demanded that CHSPSC "immediately remit $107,563" as CCG's fee for the Watsonville tax credits.

After receiving the April 2, 2020 letter, CHSPSC initiated this lawsuit by filing a complaint requesting a declaratory judgment that it did not owe CCG any additional fees under the contract. CCG filed an answer and counter-complaint asserting, among other

things, a claim for breach of contract. CCG also filed a third-party complaint against CHSI but, on June 20, 2022, the trial court entered an agreed order dismissing the third-party complaint against CHSI with prejudice.

On July 13, 2022, CHSPSC filed a motion for summary judgment asserting that the spinoff was not a "reorganization" under the contract because it did not constitute a "reorganization" under the Internal Revenue Code. Even if it was a reorganization, CHSPSC argued, the spinoff did not result in the "suspension or elimination" of the tax credits, as they remained in existence following the spinoff. That same day, CCG filed its own motion for summary judgment arguing that Section xii of the contract had been triggered because the spinoff constituted a "reorganization" that "eliminated" CHSPSC's ability to utilize Watsonville's credits.

After hearing arguments on the motions, the trial court entered an order denying CCG's motion and granting summary judgment to CHSPSC because the court concluded that the spinoff did not trigger Section xii of the contract. The court explained as follows:

> The Court finds the parties' subsequent conduct demonstrates the parties' intention, at the time the Agreement was executed, that the term "reorganization" be construed in accordance with 26 U.S. Code § 355.
> As the parties agree [the] spin-off of Watsonville did not qualify as a "reorganization" under the Internal Revenue Code, and the Court has found the Agreement contemplated "reorganization" being construed in accordance with the Internal Revenue Code, Section xii of the Agreement cannot be triggered, regardless of whether the Credits were "eliminat[ed]," because the Plaintiff's "reorganization" is a condition precedent to the "elimination" of the Credits.
> Finally, the Court finds, because Plaintiff did not breach the Agreement by refusal to pay fees as Section xii of the Agreement was not triggered by the spin-off of Watsonville, Defendant's breach of contract counterclaim fails.

CCG appealed and presents the following issue for our review: whether the trial court erred in denying its motion for summary judgment and granting summary judgment to CHSPSC.

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and

- 4 -

must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must submit evidence either "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show that he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin*, 271 S.W.3d at 83 (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

Because any party may move for summary judgment under Tenn. R. Civ. P. 56, cases sometimes involve cross-motions for summary judgment. *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 82 (Tenn. 2010). As the Tennessee Supreme Court explained in *CAO Holdings v. Trost*:

> Cross-motions for summary judgment are no more than claims by each side that it alone is entitled to a summary judgment. The court must rule on each party's motion on an individual and separate basis. With regard to each motion, the court must determine (1) whether genuine disputes of material fact with regard to that motion exist and (2) whether the party seeking the summary judgment has satisfied Tenn. R. Civ. P. 56's standards for a judgment as a matter of law. Therefore, in practice, a cross-motion for summary judgment operates exactly like a single summary judgment motion.

*Id.* at 83 (citations omitted).

ANALYSIS

I.  Applicable law

The contract contains a choice of law provision stating that the terms of the contract "shall be governed by, and construed in accordance with, the laws of the State of California."  Under California law, a party must prove the following elements to establish a claim for breach of contract:  "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011) (citing *Reichert v. Gen. Ins. Co.*, 442 P.2d 377, 381 (Cal. 1968)).  The parties agree that the first two elements have been established.  Their disagreement centers on the third element— whether CHSPSC breached the contract by refusing to pay CCG a fee for Watsonville's unused tax credits.

To answer this question, we must interpret the contract.  Under California law, "'[t]he interpretation of a contract is a judicial function.'"  *Brown v. Goldstein*, 34 Cal. App. 5th 418, 432 (Cal. Ct. App. 2019) (quoting *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1125-26 (Cal. Ct. App. 2008)).  When engaging in this function, courts "'give effect to the mutual intention of the parties as it existed' at the time the contract was executed."  *Wolf*, 162 Cal. App. 4th at 1126 (quoting Cal. Civ. Code § 1636).  "Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms."  *Id.* (citing Cal. Civ. Code § 1639).

A court construing a contract must apply the "'"clear and explicit" meaning of [the contract's terms], interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage[.]"'"  *Hewlett-Packard Co. v. Oracle Corp.*, 65 Cal. App. 5th 506, 531 (Cal. Ct. App. 2021) (quoting *AIU Ins. Co. v. Super. Ct.*, 799 P.2d 1253, 1264 (Cal. 1990) (quoting Cal. Civ. Code § 1644)).  Terms used in a technical sense "are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."  Cal. Civ. Code § 1645.

II.  Intended meaning of the term "reorganization"

CCG takes issue with the trial court's determination that the parties intended the term "reorganization" to have a technical, tax-based meaning that corresponded to the Internal Revenue Code's definition of "reorganization."  According to CCG, the contract contains no language indicating the parties intended for the term to have any sort of technical meaning.  Thus, CCG urges, the only reasonable construction of "reorganization" is its "ordinary and popular" meaning, which CCG avers is "any type of different order,

composition or structure of the corporation."[3]  CCG argues that, under this interpretation, the spinoff constituted a reorganization because it resulted in a change to the composition or structure of CHSPSC.  For the reasons discussed below, we respectfully disagree.

In interpreting a contract's terms, courts apply "the meaning a layperson would ascribe to contract language" if unambiguous, *Santisas v. Goodin*, 951 P.2d 399, 405 (Cal. 1998), but courts also recognize the "'interpretational principle that a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates.'" *Mountain Air Enters., LLC v. Sundowner Towers, LLC*, 398 P.3d 556, 561 (Cal. 2017) (quoting *Xuereb v. Marcus & Millichap, Inc.*, 3 Cal. App. 4th 1338, 1344 (Cal. Ct. App. 1992)); *see also* Cal. Civ. Code § 1647. The threshold question under California law is whether the terms of a contract are ambiguous—"that is, reasonably susceptible to more than one interpretation." *Scheenstra v. Cal. Dairies, Inc.*, 213 Cal. App. 4th 370, 389 (Cal. Ct. App. 2013) (citing *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (Cal. Ct. App. 1992)).  Although a court begins with the contract's terms to determine whether they are ambiguous, the court may consider extrinsic evidence to determine whether a material term is "reasonably susceptible to a particular meaning." *Scheenstra*, 213 Cal. App. 4th at 390.  As one California court explained:

> "The interpretation of a contract involves 'a two-step process: First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step – interpreting the contract." (*Wolf v. Superior Court* (2004) 114 Cal. App. 4th 1343, 1351, 8 Cal. Rptr. 3d 649 (*Wolf II*) [citing and quoting *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165, 6 Cal. Rptr. 2d 554 (*Winet*)]; see also *Wolf, supra*, 162 Cal. App. 4th at p. 1126, 76 Cal. Rptr. 3d 585.)

---

[3] In its appellate brief, CCG contends that this is the "ordinary and popular" meaning of the term "reorganization" based on certain dictionary definitions:

> "Reorganization" is "the action or process of reorganizing; fresh organization; an instance of this" (Oxford English Dictionary Online (2014)); "the act or process of reorganizing; the state of being reorganized" (Merriam-Webster's Collegiate Dictionary (11th ed. 2007)); "the state of being reorganized; especially:  the financial reconstruction of a business concern" (Merriam-Webster Online, *www.merriam-webster.com/dictionary* (accessed July 11, 2022), with the term "reorganize" meaning simply "to organize again or anew" (OED Online) or "to undergo or make changes in organization" (Merriam-Webster's Collegiate Dictionary, *supra*).

"When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation. If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury." (*Wolf, supra*, 162 Cal. App. 4th at pp. 1126-1127, 76 Cal. Rptr. 3d 585; see *id.* at p. 1134, 76 Cal. Rptr. 3d 585 ["that extrinsic evidence may reveal an ambiguity subjecting a contract to more than one reasonable interpretation does not mean resolution of that ambiguity is necessarily a jury question. Absent a conflict in the evidence, the interpretation of the contract remains a matter of law"].).

*Brown*, 34 Cal. App. 5th at 432-33 (internal citations omitted).

CCG is correct that the plain language of the contract does not reference the Internal Revenue Code. But, CHSPSC presented extrinsic evidence showing that the term "reorganization" is "reasonably susceptible" to having a technical, tax-based meaning that corresponds to the Internal Revenue Code's definition. *See Scheenstra*, 213 Cal. App. 4th at 390 (stating that contract terms are ambiguous if "reasonably susceptible to more than one interpretation" and that the court may consider extrinsic evidence to make its ambiguity determination). Therefore, we agree with the trial court that the term "reorganization" is ambiguous. Because there is no material conflict in the extrinsic evidence, most of which consisted of emails the parties exchanged after signing the contract, we may rely on it to interpret the contract as a matter of law. *See Brown*, 34 Cal. App. 5th at 433 (quoting *Wolf*, 162 Cal. App. 4th at 1127) ("'Absent a conflict in the evidence, the interpretation of the contract remains a matter of law.'").

Generally, there are two types of extrinsic evidence that California courts consider when interpreting a contract as a matter of law. The first type is evidence regarding the "'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.'" *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 645 (Cal. 1968) (quoting *Universal Sales Corp. v. Cal. Press Mfg. Co.*, 128 P.2d 665, 671 (Cal. 1942); *Lemm v. Stillwater Land & Cattle Co.*, 19 P.2d 785, 788 (Cal. 1933)). The second type is evidence of the parties' subsequent conduct before the dispute arose, known as "the rule of practical construction." *Warner Constr. Corp. v. City of Los Angeles*, 466 P.2d 996, 1003 (Cal. 1970). According to the California Supreme Court, the parties' understanding of the contract's terms, as shown by their conduct before any dispute arises, "'is entitled to great weight and will, when reasonable, be adopted and enforced by the court.'" *Warner*, 466 P.2d at 1003 (quoting *Woodbine v. Van Horn*, 173 P.2d 17, 22 (Cal. 1946)). Indeed, California courts have held that "[i]ntent may be inferred from a party's acts and conduct

even in the face of his express declarations to the contrary." *H. S. Crocker Co. v. McFaddin*, 307 P.2d 429, 435 (Cal. Ct. App. 1957) (citing *Trevaskis v. Peard*, 44 P. 246, 248 (Cal. 1896)). Thus, the rule of practical construction generally bars the admission of inconsistent statements after the date on which the parties "reached a stage of clear disagreement on the crucial question." *Warner Constr.*, 466 P.2d at 1003.

Regarding the first type of extrinsic evidence, the record shows that "the nature and subject matter" of the contract was tax-based. The contract concerns identifying and realizing California Enterprise Zone tax credits, and the contract uses the term "reorganization" in the context of whether an event has occurred that has a specific effect on those tax credits. Furthermore, the contract states that CCG's services are provided by "professionals" that "work exclusively in [the] specialized area" of California Enterprise Zone tax credits, and CHSPSC's in-house tax professionals reviewed and signed the contract. This evidence indicates that, despite not referencing the Internal Revenue Code, the parties intended "reorganization" to have a tax-based meaning.

The record also contains evidence of the parties' conduct before any dispute arose— the second type of extrinsic evidence—that shows they understood "reorganization" to have a tax-based meaning. For instance, seven months before the spinoff occurred, CHSPSC informed CCG that Watsonville would be spun off and specifically asked what impact, if any, that would have on the unused tax credits. CCG responded that the tax credits would spinoff with Watsonville, and CCG acted consistently with this understanding for over four years. Notably, for four years after the spinoff, CCG neither sent an invoice to CHSPSC for the unused tax credits nor told CHSPSC that the reorganization provision had been triggered. Rather, after the spinoff was completed on April 29, 2016, CCG promptly contacted Quorum to inform it that the Watsonville tax credits were available for Quorum's use. CCG also informed Quorum that "[s]ince the Credits spun out of CHS[I] and into QHC, the Credits—along with the attached agreement—are inherited by QHC." For the next several years, CCG regularly communicated with Quorum, requested copies of Quorum's tax filings, and reviewed Quorum's SEC filings to determine whether Quorum had utilized, or would be in a position to utilize, the credits. CCG even admitted that, if Quorum had used the tax credits, it would have invoiced Quorum. It was not until four and a half years later, after Quorum informed CCG that it did not anticipate being able to use the tax credits in the foreseeable future, that CCG changed its tune and began claiming that the spinoff constituted a "reorganization" under the plain meaning of the contract.[4]

---

[4] CCG contends that its relationship with Quorum should not be considered evidence indicating it believed the spinoff did not trigger the reorganization provision because it was merely attempting to "mitigate" its damages. We, like the trial court, question the accuracy of CCG's characterization of its relationship with Quorum as an attempt to mitigate damages. For four and a half years, CCG never claimed it had suffered any damages from the spinoff. We are not persuaded by this argument.

Based on the foregoing, we agree with the trial court that CCG's subsequent conduct of informing CHSPSC that, as CCG interpreted the contract, the tax credits would be spun off with Watsonville in addition to CCG's silence on the topic of owed fees for over four years after the spinoff occurred, shows that CCG did not interpret the contract to entitle it to fees resulting from the spinoff of Watsonville. In other words, CCG did not consider the spinoff to constitute a reorganization under the contract because the spinoff did not meet the Internal Revenue Code's definition of "reorganization." Because the spinoff did not constitute a "reorganization" under the Internal Revenue Code, the reorganization provision of the contract was not triggered, and CHSPSC did not breach the contract by refusing to pay CCG for Watsonville's unused tax credits. Therefore, CCG cannot establish the third element of its breach of contract claim. We affirm the trial court's decision granting summary judgment to CHSPSC and denying summary judgment to CCG.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, the California Credits Group, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

CCG also asserts that interpreting "reorganization" as having a technical, tax-based meaning violates the canon against surplusage because it renders the reorganization provision meaningless as it would never be triggered. *See surplusage canon,* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "surplusage canon" as "[t]he doctrine that, if possible, every word and every provision in a legal instrument is to be given effect); *see also* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). CCG's reliance on the surplusage canon is misplaced. Just because the spinoff did not constitute a "reorganization" under the technical, tax-based meaning of the term does not necessarily render the reorganization provision surplusage. It is possible for the provision to be triggered when applying a technical, tax-based meaning. For instance, bankruptcy constitutes a "reorganization" under the Internal Revenue Code, and a bankruptcy could result in the elimination of tax credits. In such a situation, the two conditions precedent to the reorganization provision would be met, and CCG would be entitled to a fee. We find this argument unpersuasive.