892 F.2d 83
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
SAN DIEGO GAS & ELECTRIC COMPANY, Plaintiff-Appellant,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellee.
SAN DIEGO GAS & ELECTRIC COMPANY; Southern California
Edison Company, Plaintiffs-Appellees,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellant.
SOUTHERN CALIFORNIA EDISON COMPANY, Plaintiff-Appellant,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellee.
SOUTHERN CALIFORNIA EDISON COMPANY; SAN DIEGO GAS &
ELECTRIC COMPANY, Plaintiffs-Appellees,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellant.
 Nos. 88-5857, 88-5858
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 5, 1989.
Submission Vacated May 16, 1989.
Resubmitted June 5, 1989.
Decided Dec. 12, 1989.
 
 1
 Before GOODWIN, FLETCHER and WILLIAM A. NORRIS, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Plaintiffs Southern California Edison Company (Edison) and San Diego Gas & Electric Company (San Diego) appeal a summary judgment in favor of defendant Westinghouse and a denial of leave to amend their amended complaint to add a RICO claim. Westinghouse cross-appeals a dismissal of its abuse of process counterclaims, and a denial of summary judgment to it on these claims. We affirm in part and vacate and remand in part the summary judgment in favor of Westinghouse. We also affirm the denial of leave to amend. Finally, we affirm the dismissal of Westinghouse's abuse of process counterclaims and the denial of summary judgment to it on those claims.
 
 
 4
 Edison, a public utility corporation incorporated and existing under the laws of California, is the licensed operator of the San Onofre Nuclear Generating Station Unit No. 1 (SONGS 1). Edison is the 80% owner of SONGS 1. San Diego, also a public utility corporation under California law, owns the remaining 20%.
 
 
 5
 On January 11, 1963, Edison, Westinghouse and Bechtel Corporation entered into a written agreement entitled "Agreement for Coast Nuclear Station Unit No. 1" (the SONGS 1 Agreement). The Agreement called for Westinghouse to provide steam generators and other equipment for use at the SONGS 1 plant. On March 8, 1963, San Diego acquired a 20% interest in the SONGS 1 Agreement from Edison. Article XVI of the Agreement provided that Edison, in discharging its responsibilities and obligations under the Agreement, would act as agent for San Diego. On January 1, 1968, SONGS 1 began commercial operations.
 
 
 6
 In addition to the SONGS 1 Agreement, plaintiffs and Westinghouse entered into a series of contracts from 1973 to 1979 calling for Westinghouse to periodically inspect the SONGS 1 steam generators and to report the results of these inspections to plaintiffs.
 
 
 7
 On February 4, 1976, Edison filed suit against Westinghouse in the Los Angeles Superior Court. This action came after Edison discovered some minor leakage in the steam generator tubes at SONGS 1. In its complaint, Edison alleged that Westinghouse had designed, manufactured, sold and delivered defective steam generators for use at SONGS 1. See Complaint, second and third causes of action. It further alleged that Westinghouse breached its obligations under the SONGS 1 Agreement. See id., first, sixth, seventh and eighth causes of action. Finally, it alleged that Westinghouse negligently and intentionally misrepresented facts about the steam generators to induce Edison to enter into the SONGS 1 Agreement. See id., fourth and fifth causes of action.
 
 
 8
 The 1976 suit was settled on September 12, 1978, when Edison, "acting as principal in its own behalf and as agent for [San Diego]," executed a Release agreement which insulated Westinghouse from liability under the claims raised in the 1976 complaint, and perhaps more. This issue will be addressed more thoroughly below. In consideration for the Release, plaintiffs received approximately $43,500 worth of equipment from Westinghouse to help repair the damage to the steam generators that gave rise to the 1976 suit.
 
 
 9
 In April of 1980, Edison discovered extensive leaking in the steam generator tubes at SONGS 1. After this discovery, Edison determined that, in order to repair the tubes and minimize the damage caused by the leaks, it was necessary to "sleeve" the tubes in three of the steam generators. "Sleeving" of the steam generator tubes is a process in which a smaller inner tube is inserted into the leaking tube. Water can then flow through the inner tube without coming into contact with the inner diameter of the damaged tube. The sleeving of the steam generator tubes at SONGS 1 cost approximately $71.5 million. Edison's share of this cost was about $57 million (80%), San Diego's about $14.5 million (20%).
 
 
 10
 On December 18, 1981, Edison filed application Number 61138 with the California Public Utilities Commission (PUC) to increase the rates it charges consumers for electric service. In this application, Edison requested the authority to recover, through rate increases, the $57 million it spent for the sleeving of steam generator tubes at SONGS 1. San Diego had already received permission to pass its part of the sleeving costs through to ratepayers, but this permission was subject to reversal if the PUC decided against Edison in its application. The PUC had already permitted Edison to recover from its ratepayers $181 million in replacement fuel costs arising from the SONGS 1 damage discovered in 1980.
 
 
 11
 In support of application Number 61138 to pass through the sleeving costs, Edison maintained to the PUC that Westinghouse was not liable for the damage.[1] At one point, representatives for Edison stated that Edison's chances of prevailing in a lawsuit against Westinghouse were "less than one chance in 20,000" and that "[San Diego and Edison could not] pursue such a suit in good faith." On December 13, 1982, the PUC issued an interim decision concluding that "Edison has made a prima facie showing regarding its election not to institute legal proceedings against Westinghouse, but we have yet to reach a final determination regarding the reasonableness of Edison's actions."
 
 
 12
 On March 16, 1983, the PUC issued its Second Interim Decision. The PUC stated that it "expected Edison to file suit against Westinghouse as soon as possible but no later than April 7, 1983" and that "if Edison fails to file suit it will have a heavy burden of showing the reasonableness of such actions...."
 
 
 13
 Two weeks later, on March 31, 1983, plaintiffs filed the instant suit.[2] In their complaint, they asserted claims for breach of the SONGS 1 Agreement, claims of negligence and strict liability in the design and manufacture of the SONGS 1 steam generators, and claims based upon negligent and intentional misrepresentations in connection with the SONGS 1 Agreement. On October 25, 1983, plaintiffs amended their complaint to add claims based upon the inspection service agreements. Thus, the amended complaint contained claims based upon breach of the SONGS 1 contract, (see the first, second, sixth, seventh, eighth, ninth claims for relief), negligence and strict liability for the allegedly defective steam generators, (see third and fifth claim for relief), negligent and intentional misrepresentations (fourth, tenth and fourteenth claims for relief) and breach of contract and failure to disclose under the independent inspection agreements (eleventh, twelfth, thirteenth, fourteenth claims for relief).
 
 
 14
 In the interim between the filing of plaintiffs' complaint and the amended complaint, Westinghouse moved for summary judgment. In an order dated April 18, 1984, the district court granted summary judgment to Westinghouse on all claims except those alleging fraud. The district court ruled that all of plaintiffs' non-fraud claims were barred alternatively by (1) the doctrine of judicial estoppel, and (2) the 1978 Release. The district court also ruled that plaintiffs' claims for breach of the SONGS 1 Agreement were barred by warranty provision in the SONGS 1 Agreement. Moreover, the district court ruled that economic loss was not recoverable in tort in the state of California. Finally, the district court ruled that plaintiffs had given up any claim to consequential damages through a disclaimer in the SONGS 1 contract. The district court denied Westinghouse's motion to dismiss on statute of limitations grounds, holding that plaintiffs did not "discover" their claims until 1980, which is less than four years (the statute of limitations period) before the action was commenced.
 
 
 15
 Since Westinghouse's motion for summary judgment was made before plaintiffs amended their complaint, the effect of the district court order granting summary judgment to Westinghouse was unclear on the claims raised for the first time in the amended complaint--claims for negligence, misrepresentation and breach of contract in connection with the inspection services. All parties agreed that the thirteenth and fourteenth claims in the amended complaint--claims based upon non-disclosure in connection with the inspection agreements--survived the district court order because these claims alleged fraud. The parties disagreed as to whether the eleventh and twelfth claims--claims for breach of the inspection services--were or should have been covered by the summary judgment order. Because of the uncertain status of these claims, plaintiffs sought reconsideration, advising the district court that the amended complaint included matters not contained in the original complaint and seeking a statement by the court that the eleventh and twelfth claims survived the summary judgment. Westinghouse countered by arguing that these claims were barred by the Release and by the doctrine of judicial estoppel. The district court granted summary judgment to Westinghouse on plaintiffs' eleventh and twelfth claims, but did so only on the basis of the 1978 Release. The district court declined Westinghouse's invitation to grant summary judgment on these claims on the basis of judicial estoppel.
 
 
 16
 On January 29, 1987, the district court granted Westinghouse's motion to dismiss the remaining fraud claims. The district court reasoned that all the fraud claims were covered by the Release, and would be barred by the Release unless the Release itself was fraudulently induced. The court then focused on whether plaintiffs were fraudulently induced during the negotiations that led to the 1978 Release, concluding that plaintiffs failed to raise a triable issue of fact on that question.
 
 
 17
 On February 3, 1988, the district court denied plaintiffs' motion to amend their amended complaint to add claims under RICO.
 
 
 18
 On May 17, 1984, Westinghouse filed counterclaims against plaintiffs, alleging that plaintiffs were guilty of abuse of process by instituting, maintaining and vigorously pursuing the present litigation at the behest of the PUC. On February 10, 1988, the district court granted plaintiffs' motion to dismiss the counterclaims. Westinghouse's motion for summary judgment on the counterclaims was denied on the same day.
 
 
 19
 Plaintiffs now appeal the grant of summary judgment to Westinghouse on all of plaintiffs' claims. They also appeal the denial of leave to amend their amended complaint to add a RICO claim. Westinghouse cross-appeals the dismissal of its counterclaims and the denial of summary judgment to it on those claims.
 
 
 20
 We affirm the district court's summary judgment in favor of Westinghouse with respect to all plaintiffs' claims except those relating to the inspection services Westinghouse was to perform. We vacate the summary judgment on these inspection claims and remand to the district court. We also affirm the district court's denial of leave to amend to add a RICO claim. Finally, we affirm the dismissal of Westinghouse's abuse of process counterclaims and the denial of summary judgment to Westinghouse on those claims.
 
 
 21
 I. PLAINTIFFS CLAIMS NOT BASED UPON THE INSPECTION SERVICES
 
 
 22
 Plaintiffs first ten claims for relief in the amended complaint allege breach of the SONGS 1 agreement, negligence and strict liability for the design and manufacture of the steam generators at SONGS 1, and negligent and intentional misrepresentations in connection with the SONGS 1 purchase. The district court granted summary judgment on these claims on a number of grounds. See above. Because we affirm the summary judgment with respect to these claims on the basis of the 1978 Release, we need not discuss most of the grounds relied upon by the district court.[3]
 
 
 23
 The relevant portions of the Release provide:
 
 SECTION ONE
 RELEASE OF ALL CLAIMS
 
 24
 In consideration for the supply of one "Reactor Cavity Filtration System" for use at the San Onofre # 1 Nuclear Generating Station as referenced in the Westinghouse quotation letter of August 24, 1978, RELEASORS [Plaintiffs] for themselves, their predecessors, successors, and assigns, release and forever discharge RELEASEE [Westinghouse], its predecessors, successors, and assigns from any and all claims, demands, and causes of action that RELEASORS may now have or that might subsequently accrue to RELEASORS arising out of or connected with, directly or indirectly, those events and actions alleged in the various counts of RELEASOR's Complaint No. C150027 as filed in the Superior Court of the State of California for the County of Los Angeles on February 2, 1976; accordingly said Complaint No. C150027 is incorporated by reference into the RELEASE for greater certainty. These claims, demands, and causes of action include, but are not limited to, claims that RELEASEE did not, in steam generators supplied under the contract between the parties of January 11, 1963, perform all contract obligations due under said contract, that RELEASEE was negligent and reckless in the design, fabrication, manufacture, assembly, supply, delivery, and sale of said generators; that RELEASEE both negligently and intentionally misrepresented various facts concerning said steam generators; that RELEASEE expressly warranted said steam generators and failed to honor said warranties; that RELEASEE impliedly warranted said steam generators both as to merchantability and fitness for purpose and failed to honor said warranties; and that RELEASORS are due any sums, services, or things stemming from these claims, demands, or causes of action.
 
 
 25
 * * *
 
 
 26
 * * *
 
 SECTION FIVE
 ENTIRE AGREEMENT
 
 27
 The supply of the system is the sole consideration to RELEASORS for this RELEASE, and it is expressly understood that such consideration is made and accepted in full settlement of all claims, losses, and damages arising out of the subject matter of this RELEASE as set forth above, whether known or unknown and whether or not ascertainable at the time of execution of this instrument.
 
 
 28
 We believe these terms of the Release bar plaintiffs' first ten claims. Plaintiffs argue that the Release only applies to the specific claims and allegations raised in the 1976 Complaint. Plaintiffs further argue that those claims and allegations are distinct from the claims and allegations asserted in the instant action because the problem with the steam generators that led to the 1976 suit--"denting"--is scientifically distinct from the problem that led to the corrosion discovered in 1980--"intergranular attack." Whether or not the two scientific phenomenon are meaningfully distinguishable, we reject plaintiffs' argument. While it is true that the Release refers to "those events and actions alleged in the various counts of RELEASOR'S complaint [in 1976]," it is equally true that the Release does not limit itself to the allegations and claims made in the 1976 complaint. The Release explicitly relieves Westinghouse from liability under:
 
 
 29
 claims, demands, and causes of action [which] include, but are not limited to, claims that RELEASEE did not, in steam generators supplied under the contract between the parties of January 11, 1963, perform all contract obligations due under said contract, that RELEASEE was negligent and reckless in the design, fabrication, manufacture, assembly, supply, delivery, and sale of said generators; that RELEASEE both negligently and intentionally misrepresented various facts concerning said steam generators; that RELEASEE expressly warranted said steam generators and failed to honor said warranties; that RELEASEE impliedly warranted said steam generators both as to merchantability and fitness for purpose and failed to honor said warranties....
 
 
 30
 (Emphasis added.)
 
 
 31
 The plain words of the Release do not limit its scope to the specific claims and allegations contained in the 1976 complaint; instead, they clearly state that the Release applies to all claims arising out of the SONGS 1 Agreement and the condition of the steam generators at the time of delivery and installation. As a result, we agree with the district court that the Release bars the first ten of plaintiffs' claims.[4]
 
 
 32
 Plaintiffs claim that the Release is null and void because it was fraudulently induced. We again agree with the district court that plaintiffs have failed to raise a triable issue of fact on this question.
 
 
 33
 Like the district court, we recognize that the plaintiffs' burden to establish a triable issue of fraud in the inducement of the Release is made more difficult by the death of Mr. H.F. Saliger, Jr., Edison's principal representative in negotiating the Release. This difficulty, however, does not relieve plaintiffs of the burden of "mak[ing] a sufficient showing on an essential element of [their] case with respect to which [they] have the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Plaintiffs have failed to meet that burden here. As the district court put it, "[d]espite plaintiff's conclusory allegations that there is evidence of misrepresentation in the inducement of the release, no such evidence is proffered in the voluminous exhibits submitted [by plaintiffs.]"
 
 
 34
 Plaintiffs rely on the declaration of William Gould, president of Edison. We agree with the district court that Mr. Gould's declaration is insufficient. Mr. Gould speculated that the signator of the Release, Mr. Saliger, would not have signed the release had he known of the "true corrosion problems." As the district court noted, however, Mr. Gould had no actual knowledge of what negotiations had transpired, or what was known to the Edison employees who negotiated the Release. Indeed, Mr. Gould stated that he did not even know of the existence of the Release until March of 1983. For these reasons, we affirm the district court's ruling that plaintiffs have failed to raise a triable issue of fact on fraud in the inducement of the Release.
 
 
 35
 Plaintiffs also have alleged that Westinghouse had a duty, which it breached, to disclose material facts during negotiations leading to the Release. The district court held that absent a "special relationship" between the parties, California law imposes no duty to disclose in a commercial setting such as this, citing Brae Transp., Inc. v. Coopers & Lybrand, 790 F.2d 1439 (9th Cir.1986). The court found no special relationship between the parties and therefore no duty. We note that California law recognizes a duty to disclose outside of "special relationships." Warner Construction Corp. v. City of Los Angeles, 2 Cal.3d 285, 294, 85 Cal.Rptr. 444, 449 (1970). However, we need not decide whether Warner and its progeny apply in the particular context of this case, because we agree with the district court that Edison has failed to produce any evidence of non-disclosure. Since plaintiffs have failed to discharge their burden to produce evidence showing fraud in the inducement either through misrepresentation or nondisclosure, the Release is valid and bars plaintiffs' first ten claims.
 
 II. CLAIMS BASED UPON INSPECTION SERVICES
 
 36
 Plaintiffs remaining claims--numbers 11 through 14--are a different story. They all are unrelated to the circumstances surrounding the SONGS 1 purchase agreement and instead are based upon the inspection services Westinghouse periodically performed at the SONGS 1 plant. The district court ruled that these claims were barred by the Release as well, but it declined to rule that these claims were barred for any other reason, such as judicial estoppel. Because we disagree with the district court's ruling that the Release applies to these claims, and because we see no alternative basis in the record as it now exists, for upholding the summary judgment on these claims,[5] we remand to the district court for further consideration of these claims.
 
 
 37
 Westinghouse argues that these claims are barred because the Release precludes plaintiffs from claiming "that RELEASEE [Westinghouse] both negligently and intentionally misrepresented various facts concerning said steam generators." See Release, excerpted above. Westinghouse contends that this category includes plaintiffs' claims that Westinghouse did not disclose or misrepresented the results of its inspections. The district court accepted this argument, ruling that "the release was entered into after the service contracts were, and would include these claims in its bar."
 
 
 38
 At the outset we note that our understanding of the sequence of events differs from that of the district court. Some of the inspection agreements, as they are alleged in the amended complaint, were entered into after the Release. In any event, and even if the inspection agreements all predate the Release, we find Westinghouse's interpretation wide of the mark. As we read the language Westinghouse relies upon, it is limited to misrepresentations made in connection with the SONGS 1 Agreement and the condition of the steam generators at the time of delivery and installation.
 
 
 39
 We interpret the language to have this meaning because of the way the Release is structured. The other released claims that are listed in the instrument all relate to the SONGS 1 Agreement and the condition of the steam generators at the time the steam generators were delivered and installed. For example, the first group of claims mentioned are "claims that [Westinghouse] did not, in steam generators supplied under the [SONGS 1 agreement], perform all obligations due under said contract." The next claim mentioned--"that RELEASEE was negligent and reckless in the design, fabrication, manufacture, assembly, supply, delivery and sale of said generators"--also relates to the SONGS 1 Agreement and the conditions of the steam generators at the time of delivery and installation. The next claim listed is that relied upon by Westinghouse now. The remaining claims all concern "warranties" made with regard to the steam generators--claims which are necessarily related to the circumstances surrounding the SONGS 1 Agreement. Read in this context, the provision barring claims "that [Westinghouse] negligently or recklessly represented facts about said generators" applies only to representations made in connection with the SONGS 1 Agreement and the condition of the steam generators at the time of delivery and installation. Accordingly, we vacate the district court's grant of summary judgment on plaintiffs' claims eleven through fourteen, which are premised not on the SONGS 1 Agreement but rather on Westinghouse's inspection obligations. We express no opinion as to whether plaintiffs have proffered enough evidence in the record to survive summary judgment on these claims.[6]
 
 
 40
 III. THE DENIAL OF LEAVE TO AMEND TO ADD RICO CLAIM
 
 
 41
 Denial of leave to amend a complaint under Rule 15(a) is reviewed only for an abuse of discretion. We conclude that the district court did not abuse its discretion in this case. The motion was made seven months after the fraud claims were dismissed. These fraud claims would have been the only possible predicate acts to support a viable RICO claim. If a proposed amendment could not survive a motion to dismiss, then a court plainly need not grant leave to amend.
 
 IV. WESTINGHOUSE'S COUNTERCLAIMS
 
 42
 Westinghouse cross-appeals from the district court's dismissal of its abuse of process counterclaims and the denial of summary judgment to it on these claims. We affirm the district court.
 
 
 43
 Westinghouse alleged that by instituting and maintaining a lawsuit which plaintiffs had already admitted had no chance of success, plaintiffs were guilty of the tort of abuse of process. Abuse of process under California law is a separate and distinct cause of action from malicious prosecution. To establish an abuse of the process, Westinghouse must show first that Edison and San Diego acted with "an ulterior purpose" and second that they engaged in "a wilful act in the use of the process not proper in the regular conduct of the proceeding." Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc., 42 Cal.App.3d 1157, 1168 (1986) (citing earlier cases). The district court found that Edison and San Diego had not engaged in a wilful act, even if they maintained this litigation with an ulterior purpose. The district court relied upon the Oren court's statement that "the mere filing of a lawsuit cannot constitute a wilful act" for the purpose of abuse of process. Id. This reliance on Oren was sound.
 
 
 44
 In Oren, plaintiffs alleged that defendant had maintained an earlier suit simply to extract a settlement out of plaintiff. The court ruled that filing and maintaining the lawsuit was not a wilful act under the second prong of the abuse-of process test. We fail to see how Westinghouse can get around Oren. Oren expressed a concern about overdeterring lawsuits that are based upon probable cause. And, as Westinghouse admits, "probable cause" is not necessarily a defense to an abuse of process claim. See Reply Brief of Westinghouse at 10. Whether plaintiffs in the earlier lawsuit expected to win is irrelevant to whether there was probable cause to bring suit. Unless Westinghouse is arguing that pessimistic litigants should be punished more than optimistic litigants, Oren seems to bar the abuse of process counterclaims. Whether or not Westinghouse has a viable malicious prosecution claim, Westinghouse must await the outcome of the instant case, and then try to plead and prove that Edison and San Diego lacked probable cause.
 
 
 45
 For the foregoing reasons, we AFFIRM in part, VACATE in part, and REMAND for proceedings consistent with this disposition.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Circuit Rule 36-3
 
 
 [1]
 Edison claims that it did not advise the PUC of the 1978 Release at this time because Edison itself was unaware of the existence of the Release
 
 
 [2]
 After this action was filed, the PUC permitted plaintiffs to pass on the steam generator repair costs. The PUC also allowed plaintiffs to pass on all costs incurred in litigation against Westinghouse. The PUC has since ruled, in September of 1986, upon learning of the Release executed in 1978, that the SONGS 1 sleeving costs cannot be passed on in their entirety. Rather, because the PUC concluded that plaintiffs were imprudent in executing the 1978 Release and failing to disclose that Release to the PUC, plaintiffs have been permitted to pass on only 25% of the sleeving costs to the ratepayers. Indeed, the PUC indicated that if it had known of the Release, this "knowledge might have changed the Commission's past decision." It is not clear by this statement whether the Commission was referring to its decision to permit the repair costs to be passed through to the ratepayers, or its decision to suggest to Edison that it file suit against Westinghouse. Finally, we note that to date plaintiffs have been permitted to pass on 100% of the fuel replacement costs, mentioned above, which were incurred as a result of the problems at SONGS 1
 
 
 [3]
 Thus, we need not decide whether the district court properly invoked the doctrine of judicial estoppel to bar plaintiffs' claims
 
 
 [4]
 San Diego contends that the Release, even if valid and applicable, binds only Edison and Westinghouse. We agree with the district court that the Release binds San Diego as well. As noted above, the SONGS-1 Agreement established Edison as agent for San Diego "in carrying out the responsibilities and obligations of Edison under this Agreement." Edison executed the Release "in its own behalf and as agent for [San Diego]." San Diego has not produced any evidence to support its contention that Edison lacked actual authority to sign the release. Even in the absence of actual authority, Westinghouse was entitled to rely upon Edison's apparent authority to execute the Release. Therefore, the Release is binding on San Diego
 
 
 [5]
 Most of the district court's grounds for summary judgment on the first ten claims--e.g., the warranty provisions of the SONGS 1 Agreement and the consequential damages waiver in the SONGS 1 Agreement--are clearly inapplicable to claims based upon Westinghouse's inspection obligations because they are specific to the SONGS 1 Agreement. The only ground other than the Release that could possibly provide a basis for affirming the summary judgment on the inspection service claims is judicial estoppel. We decline to consider the applicability of judicial estoppel in these circumstances, however, because the record is undeveloped on what was presented to the PUC regarding Westinghouse's provision of inspection services
 
 
 [6]
 Plaintiffs argue that they have raised triable issues of fact with respect to misrepresentations in connection with the inspection services, and that these misrepresentations support plaintiffs' contention that the Release was fraudulently induced. As stated above, we express no opinion as to whether plaintiffs have raised triable issues of fact with respect to misrepresentations in connection with the inspection services. We do note, however, that none of plaintiffs' evidence suggests that the alleged misrepresentations in the inspection services induced plaintiffs to enter into the Release. As a result, we decline plaintiffs' invitation to reopen the issue of fraudulent inducement of the Release