Filed 10/21/14  Villa Garfield, Inc. v. The city of Monterey Park CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VILLA GARFIELD, INC., | B252158 |
| Cross-complainant and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. GC045112) |
| THE CITY OF MONTEREY PARK, | |
| Cross-defendant and Respondent. | |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County.  Anthony J. Mohr and Lee Smalley Edmon, Judges.  Affirmed in part, reversed in part and remanded with directions.

Steiner & Libo and Leonard Steiner for Cross-complainant and Appellant.

Mark D. Hensley, City Attorney; Jenkins & Hogin, Gregg W. Kettles and Trevor Rusin for Cross-defendant and Respondent.

_____

Villa Garfield, Inc. (Developer) appeals from the dismissal of its first amended cross-complaint (FACC) against the City of Monterey Park (City) based on the trial court's order sustaining the City's demurrer without leave to amend. In the event that the dismissal is reversed, the Developer contends that the trial court's award of $37,618.55 in attorney fees to the City as the prevailing party should be reversed. Alternatively, the Developer contends that the award improperly included $11,166 in attorney fees incurred by the City before the cross-complaint was filed. We reverse and remand with instructions for the trial court to allow the Developer to amend its declaratory relief cause of action, and to state causes of action for breach of contract and/or breach of the implied covenant of good faith and fair dealing. Further, we reverse the award of $37,618.55 in attorney fees. In all other respects, we affirm.

## FACTS

The Developer filed a FACC against the City setting forth causes of action for negligence, indemnification, apportionment of fault, revision of contract, and declaratory relief. According to the FACC, the Developer entered into an agreement entitled Master Agreement and Covenant Concerning Use and Resale of Residential Units (Master Agreement) which contained affordable housing restrictions on the Developer's sale of condominium units at a project known as Villa Garfield (property). In particular, the Master Agreement provided that no unit could be sold until the City verified, inter alia, that the sale price did not exceed identified limits. Pursuant to the Master Agreement, "the City established and provided the selling prices for each unit at the [p]roperty, and [the Developer] justifiably relied on those sale prices" when making sales. In March 2011, purchasers of some of the units sued the Developer alleging that the sale prices exceeded the limits set forth in the Master Agreement. The FACC made no attempt to plead around the Government Tort Claims Act.

The City demurred to the FACC on the following grounds: the first and third causes of action for negligence and apportionment of fault are barred by Government Code sections 815, 818.4, 818.6 and 820.4, and they are deficient because the City did not owe the Developer a duty of care; the FACC is barred by the hold harmless clause in

the Master Agreement; the fourth cause of action for revision of contract is deficient because it fails to allege a mutual or unilateral mistake, and because the revision suggested by the Developer would make the Master Agreement conflict with the City's Municipal Code and the state's affordable housing regulations; the FACC is barred by the one-year statute of limitations section set forth in Government Code section 911.2, and the two-year statute of limitations set forth in Code of Civil Procedure section 339;[1] the FACC is deficient because the claims are not ripe; and there is no basis for the fifth cause of action for declaratory relief.

The trial court sustained the demurrer without leave to amend. As to negligence and apportionment of fault, the trial court concluded that the City did not owe the Developer a duty of care, the Developer did not plead around the Government Tort Claims Act, and the FACC failed to allege how the Developer was injured by the City's purported negligence. Regarding equitable indemnity, the trial court ruled that it was barred by the hold harmless clause in the Master Agreement. The trial court found that the revision of contract cause of action was defective because it did not allege a mistake of fact not caused by the Developer's neglect of a legal duty. Last, the trial court ruled that there was no basis for declaratory relief. The trial court subsequently entered a judgment of dismissal.

The City moved for attorney fees pursuant to a fee shifting provision in the Master Agreement, including $26,452.55 in attorney fees incurred defending the Developer's claims, and $11,166 in attorney fees predating the cross-complaint and incurred to investigate and enforce the Master Agreement. The trial court awarded the City the total amount requested ($37,618.55) on the grounds that it was the prevailing party under section 1032, and on the further ground that attorney fees can be recovered as a cost pursuant to section 1033.5, subdivision (a)(10)(A). According to the trial court, the recovery of $11,166 in attorney fees predating the cross-complaint could be recovered as

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

costs pursuant to the terms of the Master Agreement as well as Civil Code section 1717, subdivision (a).

This timely appeal followed.

## DISCUSSION

### I. The Dismissal of the FACC.

A. *Standard of Review*.

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled.  We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.  [Citation.]  Further, we treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law.  [Citations.]  When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.]  And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment:  if it can be, the trial court has abused its discretion and we reverse.  [Citation.]"  (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)  "In assessing whether plaintiffs should be allowed leave to amend, we determine de novo whether the complaint states facts sufficient to state a cause of action under any possible legal theory.  [Citation.]"  (*Id*. at p. 870.)

B. *Negligence and Apportionment of Fault*.

It is established that because "all California governmental tort liability flows from the [Government] Tort Claims Act [citations], the plaintiff must plead facts sufficient to show his cause of action lies outside the breadth of any applicable statutory immunity.  [Citations.]"  (*Keyes v. Santa Clara Valley Water Dist.* (1982) 128 Cal.App.3d 882, 885–886.)  One basis for the trial court's decision to sustain the City's demurrer to the negligence and apportionment of fault causes of action was Developer's failure to plead

4

around the limitations on liability in the Government Tort Claims Act.[2] On this issue, the Developer offers no argument. Due to this defect, the trial court ruled within the bounds of the law as to those causes of action.

The question remains, however, whether the Developer should have been granted leave to amend. The answer depends on whether the Developer can plead around the immunity in Government Code section 818.8. It provides: "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional." (Gov. Code, § 818.8.)

Case law explains that this statute exempts a public entity from liability when it makes a misrepresentation that interferes with a commercial or financial interest. "'This is true even if the misinformation relied upon is gratuitously disseminated or the allegations of the complaint are couched in terms of code violations by the government entity and not misrepresentations per se.' [Citation.]" (*Los Angeles Equestrian Center, Inc. v. City of Los Angeles* (1993) 17 Cal.App.4th 432, 449–450.) "Thus, . . . [a] governmental immunity has been found where: the department of building and safety erroneously notified an individual that her activities violated a zoning ordinance [citation]; the DMV negligently provided a certificate of ownership for a stolen automobile [citation]; a city misstated that dwellings on real property were legally authorized [citation]; and city inspectors misrepresented and suppressed facts concerning a structure's compliance with the building code [citation]." (*Lundeen Coatings Corp. v. Department of Water & Power* (1991) 232 Cal.App.3d 816, 833.)

Here, the approvals (either expressly or tacitly) represented that the prices for the units were permissible and complied with the terms of the Master Agreement. Thus, we conclude that the City has immunity.

We reject the Developer's argument that its tort based claims are saved by Government Code section 814. It provides that nothing in the Government Tort Claims

---

[2] On page 6 of its order, the trial court stated: "The [FACC] points to no statute that creates negligence liability as against the City in this case."

5

Act "affects liability based on contract or the right to obtain relief other than money or damages against a public entity or public employee." (Gov. Code, § 814.) The problem for the Developer is that even though the Master Agreement is the source of any tort duty the City might have, liability for its negligence would stem from tort law.

Case law backs our analysis.

Accompanying """"every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract." The rule which imposes this duty is of universal application as to all persons who by contract undertake professional or other business engagements requiring the exercise of care, skill and knowledge; the obligation is implied by law and need not be stated in the agreement [citation].' [Citations.]" (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515; [the same act may be a tort and breach of contract]; *Eads v. Marks* (1952) 39 Cal.2d 807, 810–811 [same]; *Erlich v. Menezes* (1999) 21 Cal.4th 543, 552 [acknowledging that acts constituting a breach of contract may violate a social policy that merits tort liability].)

As further explained and contextualized by our Supreme Court in *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 106–107: "The courts 'have extended the tort liability for misfeasance to virtually every type of contract where defective performance may injure the promisee. An attorney or an abstractor examining a title, a physician treating a patient, a surveyor, an agent collecting a note or lending money or settling a claim, or a liability insurer defending a suit, all have been held liable in tort for their negligence. . . . The principle which seems to have emerged from the decisions in the United States is that there will be liability in tort for misperformance of a contract whenever there would be liability for gratuitous performance without the contract— which is to say, whenever such misperformance involves a foreseeable, unreasonable risk of harm to the interests of the plaintiff.' [Citation.] Stated another way, "'[c]onduct which merely is a breach of contract is not a tort, but the contract may establish a

6

relationship demanding the exercise of proper care and acts and omissions in performance may give rise to tort liability.'" [Citation.]"

Next, the Developer argues that its claims are saved by *E.H. Morrill Co. v. State of California* (1967) 65 Cal.2d 787, 793 (*E.H. Morrill*).

*E.H. Morrill* involved an action in which a contractor alleged that the state provided defective plans and specifications in connection with a construction contract. Our Supreme Court held that the contractor had stated a cause of action for breach of implied warranty, and further that it could "amend the complaint to allege facts sufficient to constitute a cause of action for fraudulent misrepresentation based on the contract." (*E.H. Morrill*, *supra,* 65 Cal.2d at p. 793.) The court later specified that the plaintiff could "allege that the state intended to induce reliance on its misrepresentation of conditions, if it is so inclined." (*Id*. at p. 794.) In other words, *E.H. Morrill* essentially held that a person can sue a public entity for fraudulent inducement of a contract based on misrepresentations in the contract itself.

To reach this conclusion, the *E.H. Morrill* court relied on Government Code section 814, and also on its earlier decision in *Souza & McCue Constr. Co. v. Superior Court* (1962) 57 Cal.2d 508, 510 (*Souza*), in which the court stated: "A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented. [Citations.] This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness. The fact that a breach is fraudulent does not make the rule inapplicable. [Citations.]" Based on the rule, the *Souza* court concluded that a contractor's proposed pleading based on misleading plans and specifications was viable because it stated a "cause of action in contract on the basis of the alleged fraudulent breach by" a governmental entity. (*Id*. at p. 511.) Viewed properly, *Souza* held that a fraudulent inducement claim based on misrepresentations in a contract is permissible because it is

7

simply an alternative claim for breach of implied warranty and therefore is construed as a claim that arises in contract.

In *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285 (*Warner*), the court explained: "A fraudulent concealment often composes the basis for an action in tort, but tort actions for misrepresentation against public agencies are barred by Government Code section 818.8." (*Warner*, *supra*, at pp. 293–294.) Nonetheless, a contractor has "a cause of action in contract" when it is damaged because a public entity failed to disclose material facts and entered into a contract that contained misrepresentations. (*Id*. at p. 294.) The court added: "'It is the general rule that by failing to impart its knowledge of difficulties to be encountered in a project, the owner will be liable for misrepresentation if the contractor is unable to perform according to the contract provisions.' [Citations.]" (*Ibid.*) Laying the foundation for its analysis, the *Warner* court cited to precedent thusly: "Interpreting [Government Code sections 814 and 818.8], we held in [*E.H. Morrill*] that [Government Code] section 818.8 barred a tort action for deceit against a public entity, but did not affect an action in contract for breach of warranty." (*Warner*, *supra*, at p. 294, fn. 4.)

The rule in *Souza* was recently reaffirmed in *Los Angeles Unified School Dist. v. Great American Ins. Co.* (2010) 49 Cal.4th 739, 748. Elucidating its reasoning, the court explained that although a public contractor who was misled by incorrect plans "may not be entitled to quantum meruit recovery for work performed beyond the contract requirements [citation], and . . . [Government Code] section 818.8 bars tort actions for fraudulent misrepresentation, the contractor retains a cause of action in contract [citations]. As we explained in *Souza*: 'When the state makes a contract with an individual it is liable for a breach of its agreement in like manner as an individual, and the doctrine of governmental immunity does not apply.' [Citation.]" (*Los Angeles Unified School Dist. v. Great American Ins. Co., supra,* at p. 749, fn. omitted.)

Due to these precedents, we are forced to conclude that the Developer's action is distinguishable from *E.H. Morrill*, *Souza* and *Warner* because it is not a fraudulent

8

inducement claim based on misrepresentations in the Master Agreement, and is not equivalent to an implied warranty claim.

Finally, we cannot accept the Developer's suggestion that Government Code section 818.8 "concerns conduct of a public entity that is passive in nature[.]" The Developer cites no supporting law. Moreover, misrepresentation is covered by the statute, and a misrepresentation is active conduct.

C. *Indemnity*.

Though the FACC does not identify the type of indemnity sought, the type can be inferred. "Historically, the obligation of indemnity took three forms: (1) indemnity expressly provided for by contract (express indemnity); (2) indemnity implied from a contract not specifically mentioning indemnity (implied contractual indemnity); and (3) indemnity arising from the equities of particular circumstances (traditional equitable indemnity). [Citation.]" (*Prince v. Pacific Gas & Electric Co.* (2009) 45 Cal.4th 1151, 1157, fn. omitted.) Now, only two types of indemnity are recognized: express indemnity and equitable indemnity. (*Ibid*.) Because the Developer does not claim relief based on an express indemnity provision in the Master Agreement, we conclude that the Developer seeks equitable indemnity. In addition, it must be acknowledged that at "'the heart of the doctrine [of equitable indemnity] is apportionment based on fault.'" (*Heritage Oaks Partners v. First American Title Ins. Co.* (2007) 155 Cal.App.4th 339, 348.) In our view, the alleged cause of action for apportionment of fault overlaps the cause of action for equitable indemnity, so we view them as a unity.

Because there is no legal distinction between the two causes of action, we conclude that the ruling as to apportionment of fault applied with equal force to equitable indemnity. As a result, our analysis is the same. The demurrer was properly sustained, and the Developer cannot amend.

D. *Revision of Contract*.

The revision of contract claim alleged: "As a result of either the mutual mistake of the parties to the Master Agreement, or a mistake by [the Developer] concerning the Master Agreement which the City knew or suspected at the time, the Master Agreement

9

did not truly express the intention of the parties as to, among other things, the prices at which the units at the Property could be sold. [¶] By reason of the foregoing, [the Developer] respectfully requests that the Master Agreement be revised by the court to provide, among other things, that the sale prices of the units at the Property approved by the City are the proper sale prices."

The Developer contends that the allegations are sufficient. We disagree.

The law permits revision of a contract to express the true intention of the parties when "through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties[.]" (Civ. Code, § 3399; *Lemoge Electric v. County of San Mateo* (1956) 46 Cal.2d 659, 663 ["The purpose of reformation is to correct a written instrument in order to effectuate a common intention of both parties which was incorrectly reduced to writing"].) The "equitable remedy of reformation is not available for a mistake of fact that is caused by the neglect of a legal duty. [Citation.]" (*Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1074; Civ. Code, § 1577.)

"'The rules of pleading in actions for the reformation of contracts are well established, and should be familiar. The complaint should allege "what the real agreement was, what the agreement as reduced to writing was, and where the writing fails to embody the real agreement." [Citation.]'" (*Totten v. Underwriters at Lloyd's London* (1959) 176 Cal.App.2d 440, 448.)

The allegations in the revision of contract claim imply that the Master Agreement set definitive prices for the low and moderate income housing units, and that those were the prices at which the units actually sold. These allegations are deficient because they do not allege what the actual agreement was by setting forth the agreed prices, and they do not establish how the written agreement varied from the intention of the parties. Moreover, the allegations in the revision of contract cause of action are contradicted by the common allegations in the FACC. According to those allegations, the Master Agreement provided that sale prices could not exceed the "Affordable Housing Cost," and that "the City established and provided the selling prices for each unit[.]" In other

words, the common allegations suggest that the Master Agreement set forth a formula for establishing price ceilings, and it was the City's contractual obligation to ensure the ceilings were not exceeded. They do not suggest that the Master Agreement established actual prices in advance. Thus, the FACC failed to sufficiently allege a mistake supporting revision of the contract.

Our conclusion is bolstered by the Developer's opening brief. It does not defend the specific allegations in the revision of contract cause of action suggesting that there was a mutual or unilateral a mistake as to unit prices. Rather, without any record citations, it avers that the FACC alleged "a mistake existed as to what was required under the Master Agreement regarding the role of the City in setting, verifying and confirming the sale price of 'Affordable Units;'" the FACC "makes clear that there is confusion as to the roles of the parties to the Master Agreement in setting the sale price of 'Affordable Units'; and the Master Agreement does not indicate in any meaningful or discernable way [how to determine] at what prices [units may be sold][,] or what process must be followed in order to determine the proper sales prices so that [the Developer is] not exposed to unending liability." Even if this was an accurate characterization of the allegations in the revision of contract cause of action, it would not matter because a key ingredient is missing. That ingredient is the actual agreement between the parties that was mistakenly not included in the Master Agreement. If the Master Agreement is confusing or vague on a particular point, and the parties never had a meeting of the minds regarding what was intended, the contract cannot be revised. (*Bailard v. Marden* (1951) 36 Cal.2d 703, 708 ["To obtain the benefit of [Civil Code section 3399], it is necessary that the parties shall have had a complete mutual understanding of all the essential terms of their bargain; if no agreement was reached, there would be no standard to which the writing could be reformed"].)

Also in the opening brief, the Developer states that it "believed that it had complied with the Master Agreement in selling 'Affordable Units' by submitting such applications and prospective purchasers to the City and looking to the City to confirm, verify and approve the sales prices and the purchasers. [The Developer's] understanding

11

of the process was that it was to follow . . . the Master Agreement, and [the Developer] relied justifiably on the City to set, verify and confirm the sales prices for every unit sold at the Property." None of these points support a cause of action for revision of the Master Agreement because they were not specifically alleged in the cause of action. Furthermore, they do not establish an intention of the parties that was mistakenly omitted from the Master Agreement.

Next, the Developer highlights that the City demurred in part on the grounds that it was not required to verify or certify sale prices. According to the Developer, "[s]uch an assertion by the City appears contrary to the express statements of the Master Agreement in provisions 2(b) and 4(b). This clearly demonstrated a mutual mistake or there was a unilateral mistake on the part of [the Developer] as to the obligations of the Master Agreement." In our view, these points are unpersuasive. If the parties had divergent readings of the Master Agreement, then it is undeniably suggested they did not have the same intention, and that the Master Agreement's terms were not the result of a mutual mistake. The claim of unilateral mistake fails as well because the Developer does not suggest that the City suspected or knew the Developer believed the City was required to verify or certify sale prices, and that the Master Agreement failed to include language to that effect.

Elsewhere in the opening brief, the Developer complains that there "is no definitive statement in the Master Agreement as to what the sales price of an Affordable Unit should be other than the maximum price set by the City for sale of Units after April 30, 2007. This makes it impossible for [the Developer] to know at what price [it] should have been and should be selling units and subjects [the Developer] to constant and continuing liability, even though [the Developer] submitted all potential sales and information on proposed purchases and purchasers to the City for verification, confirmation and approval of the sales transactions and sales prices. Such circumstances are intolerable and place [the Developer] at continual risk of future claims as to every sale at the Property. Additionally, it makes [the Developer's] prior obligations and duties regarding units already sold, impossible to determine. For these reasons, revision of the

12

Master Agreement is necessary." This argument misses the mark. Instead of suggesting that the Master Agreement did not embody the intention of the parties, the Developer suggests that the Master Agreement provides insufficient price guidance and therefore should be revised. But that is tantamount to a request that the courts rewrite the Master Agreement. As we have explained, revision is allowed only to conform a contract to the parties' intention.

Having concluded that the revision of contract cause of action was defective, we turn our attention to whether it can be amended. In its appellate briefs, the Developer fails to inform us what the real agreement was, and how the Master Agreement varied from the real agreement. Thus, we perceive no grounds upon which the Developer can amend its pleading.

E. *Declaratory Relief*.

The fifth cause of action alleged: "An actual controversy now exists between [the Developer] and [the City] concerning their respective rights and obligations to each other and to the plaintiffs under the Master Agreement," and the Developer requested "a judicial determination as to the rights and obligations of the parties and the plaintiffs under the Master Agreement, including . . . that the Master Agreement be revised to provide, among other things, that the sale prices of the units at the Property approved by the City are the proper sale prices."

The Developer contends that the allegations are sufficient under on section 1060, citing *Market Lofts Community Assn. v. 9th Street Market Lofts, LLC* (2014) 222 Cal.App.4th 924, 931 (*Market Lofts*). In *Market Lofts*, we explained that a pleading need only allege ultimate facts showing an actual controversy relating to the legal rights and duties of the respective parties. If that requirement is met ""and no basis for declining declaratory relief appears, the court should declare the rights of the parties whether or not the facts alleged establish that the plaintiff is entitled to [a] favorable declaration. [Citations.]'" [Citation.]" (*Ibid.*)

One obstacle for the Developer is that declaratory relief "generally operates prospectively to declare future rights, rather than to redress past wrongs. [Citations.] It

13

serves to set controversies at rest before they lead to repudiation of obligations, invasion of rights or commission of wrongs. In short, the remedy is to be used in the interests of preventive justice, to declare rights rather than execute them. [Citation.]" (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 909.) Here, the FACC in general fails to demonstrate anything other than past wrongs, i.e., the City's failure to properly verify prices under the Master Agreement, a mutual or unilateral mistake regarding the sale prices for the units, and the possibility that the Developer sold units to the plaintiffs for inflated, unauthorized prices.

At oral argument, counsel for the Developer indicated that sales are ongoing. Consequently, there is a reasonable probability the Developer can amend to state a cause of action for declaratory relief regarding the future obligations of the City to verify that prices satisfy the Master Agreement.

F. *The Developer must be given leave to amend to state contract claims.*

Based on the allegations in the FACC, there is an indication that the City had a duty to verify the prices for the units and either failed to perform that duty, or performed that duty carelessly. As a result, the Developer should be given leave to amend to state a claim for either breach of contract or breach of the implied covenant of good faith and fair dealing. With respect to a potential claim for breach of the implied covenant of good faith and fair dealing, we remind the parties that the covenant can be breached by "objectively unreasonable conduct, regardless of the actor's motive. [Citation.]" (*Carma Developers* (*Cal.*)*, Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373.) If the Developer's evidence or information supports it, the Developer can state a claim for breach of the implied covenant of good faith and fair dealing by alleging that the City engaged in objectively unreasonable conduct when verifying sale prices because it failed to diligently follow the terms of the Master Agreement by applying the formulas for calculating those prices.

Though the City argues in its brief that the express indemnity clause in the Master Agreement bars it from being sued, this argument is problematic and, in any event, cannot be resolved at the demurrer stage.

14

The Master Agreement provides: "[The] Developer agrees to indemnity, defend and hold harmless the City from and against all claims, liens, claims of lien, losses, damages, costs, and expenses, including attorneys' fees, . . . arising in any way from the construction, sale or rental of the Affordable Housing, or from any default by [the] Developer in the performance of its obligations under this Agreement; provided, however, that [the] Developer shall not be required to indemnify, defend or hold harmless the City from claims, losses, damages, costs and expenses related solely to the active negligence or willful misconduct of the City. For purposes of this Section, 'City' includes . . . the City's elected and appointed officials, officers, employees and agents."

According to the parties, there is a question as to whether the FACC sufficiently alleged the exception to the indemnity clause.

The FACC alleged the following: Through the Master Agreement, the City established the selling prices for each unit at the property. The Developer submitted all documentation required by the City concerning prospective buyers and sales prices since 2007, and the Developer sold units at the property only when the City approved the sales. The Developer would not have entered into those sales without those approvals. Pursuant to the Master Agreement, the City owed the Developer a duty to exercise reasonable care when approving the sale of units. The City actively breached its duty by failing to ensure that the sale of units to the residents complied with the terms and conditions of the Master Agreement. Had the City not breached the duty of care, the Developer would not have sold the units. If the residents prevail in their respective lawsuits, the Developer will be damaged.

These allegations could potentially support a claim for breach of contract or breach of the implied covenant of good faith and fair dealing.

Bearing in mind the rule that a pleading must be liberally construed and the factual allegations must be accepted as true (*Yvanova v. New Century Mortgage Corp.* (2014) 226 Cal.App.4th 495, 499), we conclude that the FACC, as it stands, is not barred by the indemnity clause in the Master Agreement. Because the FACC alleged that the Developer would not have sold the units absent the City's negligence, it sufficiently

15

alleged that the City's breach was the sole cause of Developer's damages. Therefore, there is no impediment to the Developer amending its pleading to state contract based claims premised on the same fact pattern. While the City argues that the Developer was negligent, and therefore the City was not the sole cause of any damages, that is a factual issue that cannot be decided via demurrer. (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216 [in connection with demurrers and motions for judgment on the pleadings, a challenge to the pleading must be rejected "'where there are material factual issues that require evidentiary resolution'"].)

Additionally, the Developer should be given the opportunity to plead around or prove that the indemnity clause is not an exculpatory clause. Whether it is exculpatory is by no means a simple issue, and we express no opinion as to how it should be resolved. Case law explains: "[I]f a party seeks, in a noninsurance agreement, to be indemnified for protections beyond those afforded by the doctrines of implied or equitable indemnity—for his or her own active negligence, or regardless of the indemnitor's fault—the language on the point must be particularly clear and explicit and will be construed strictly against the indemnitee. [Citation.] [¶] This rule applies when the indemnitee seeks to be indemnified for claims made by the other party to the contract— the indemnitor—itself. 'A clause which contains the words "indemnify" and "hold harmless" is an indemnity clause which generally obligates the indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons. [Citation.] Indemnification agreements ordinarily relate to third party claims.' [Citation.] 'An indemnity agreement may provide for indemnification against an indemnitee's own negligence, but such an agreement must be clear and explicit and is strictly construed against the indemnitee.' [Citation.] Cases which have interpreted an indemnification agreement to act as an exculpatory clause between the parties to the agreement have involved agreements which contain language clearly providing that the indemnification clause applied to such claims. [Citation.] Putting it another way, as one court explained, 'If [the] parties go out of their way and say "we really, really mean it," language clearly contemplating exculpation may be enforced.' [Citation.]" (*City of Bell*

16

*v. Superior Court* (2013) 220 Cal.App.4th 236, 250–251; *Queen Villas Homeowners Assn. v. TCB Property Management* (2007) 149 Cal.App.4th 1, 6–9 [refusing to interpret indemnity clause "in an exculpatory manner"].)

In a letter brief filed by the City in response to our invitation to brief the issue of whether the Developer can amend to state contract based claims, the City raised these objections: (1) there are no contract based damages; (2) any contract claims are not ripe for adjudication; (3) any contract claims are barred by the statute of limitations because they accrued more than four years before the cross-complaint was filed; (4) the City did not breach any express contractual duty; (5) the City has not breached the implied covenant of good faith and fair dealing; and (6) contract claims are barred by the express indemnity clause in the Master Agreement.

We tackle these issues below.

1. Damages.

"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) Specifically, case law provides that if a first party breaches a contract and causes the second party to the contract to be sued by a third party, the second party can recover the incurred attorney fees as contract damages. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 897, pp. 989–990; *De La Hoya v. Slim's Gun Shop* (1978) 80 Cal.App.3d Supp. 6, 10; *Pacific Sunwear of California, Inc. v. Olaes Enterprises, Inc.* (2008) 167 Cal.App.4th 466, 483–484.)

There is no obstacle to the Developer successfully alleging damages on the grounds that it incurred attorney fees after it was sued by the homeowners for overcharging them for their units.[3]

---

[3] As an additional basis for damages, the Developer argues: If the sales prices were improper, and if the City had refused to approve those sales prices, the Developer was not required to reduce the sales prices and sell to those prospective purchasers. Thus, it could

17

We are not persuaded to the contrary by *Philipson & Simon v. Gulsvig* (2007) 154 Cal.App.4th 347, 364 (*Gulsvig*), a case relied upon by the City to backstop its position. In *Gulsvig*, a client sued a lawyer, and the lawyer cross-complained for fraud. The lawyer's alleged fraud damages were the costs of being sued. (*Id*. at p. 359.) As part of the court's discussion of whether the cross-complaint was subject to the client's anti-SLAPP motion, the court examined whether the lawyer had demonstrated a probability of prevailing. Concluding that the answer was no, the court explained in part "that the only damages specifically alleged—the 'possible exposure, attorneys fees and costs' associated with being 'brought into this action' are not recoverable *in this action*. First of all, until [the lawyer] is *actually* exposed to liability (toward a third party, not [the client]), such damage claims are not ripe or recoverable against [the client]. 'Generally speaking, to be actionable, harm must constitute something more than "'nominal damages, speculative harm, or the threat of future harm—not yet realized. . . .'"' [Citations.] What's more, the costs and fees [the lawyer] may be incurring by participating in this litigation are, in the absence of a fee-shifting agreement, not recoverable herein. The traditional 'American rule' is that each party to litigation must bear its own fees. [Citation.]" (*Id*. at p. 364, fn. omitted.)

*Gulsvig* is distinguishable because the lawyer was attempting to collect attorney fees as a cost incurred in the client's action. Here, the Developer would be seeking damages arising from being sued by third parties.

2. <u>Ripeness</u>.

A cause of action is ripe when it reaches the point where a court can issue an intelligent and useful decision. (*Breaux v. Agricultural Labor Relations Bd.* (1990) 217

have declined to sell to those prospective purchasers and solicited different prospective purchasers with sufficient income to justify the higher sales prices. We express no opinion as to whether such damages would be recoverable as permissible contract damages under Civil Code section 3300. (Civ. Code, § 3300 ["For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom"].)

Cal.App.3d 730, 741.) This "'"'"prevent[s] courts from issuing purely advisory opinions. [Citation.] In this regard, "the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.'"'"' (*Ibid*.)

Because we have concluded that there is a reasonable possibility that the Developer can allege damages, we reject the City's assertion that the Developer's potential contract claims are not ripe. If there are damages, then the trial court can issue an intelligent and useful decision.

### 3. Statute of limitations.

There is a four-year statute of limitations for breach of contract actions. (§ 337.) The statute of limitations does not accrue until a party has suffered actual damages. (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1123, fn. 6.) According to the FACC, the homeowner lawsuits against the Developer were filed in 2011 and 2012. Until those lawsuits were filed and the Developer had to incur attorney fees, it was not damaged. The inescapable deduction is that its claims did not accrue until 2011 and therefore cannot be labeled as stale given that the cross-complaint and the FACC were filed in 2012, well under the wire.

### 4. Breach of an express contractual duty.

The City suggests that the Master Agreement gave it "review rights . . . to enable it to monitor" the Developer, and that "the review was not for [the Developer's] benefit but rather for the City's." According to the City, the "review provisions were intended to give the City a tool to protect its rights under the Master Agreement and ensure [the Developer's] compliance with state and local affordable housing law. As a result, the City did not breach its duties to [the Developer] under the contract. Further, allowing the cross-complaint to be amended [to state a cause of action for breach of contract] would have the effect of allowing a disguised indemnity claim in direct conflict with the terms of the Master Agreement."

19

The upshot is that the City denies that it owed the Developer a duty to confirm sale prices. "The existence of a contractual legal duty is determined by the terms of the parties' contract. [Citation.]" (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395, fn. 5.) At the pleading state, a contractual duty can be stated in a complaint. If a contract is incorporated by reference, it will necessarily control any duty analysis when there is a demurrer. But there is an exception. If the contract is ambiguous, and if the pleading party alleges that the contract is ambiguous but has a particular intended meaning that is reasonable in light of the contractual language, a trial court cannot sustain a demurrer on the grounds that a duty is lacking. Rather, the trial court will have to defer any decision on the interpretation of the contract until a later stage in the proceeding when the parties submit parol evidence. (*Hervey v. Mercury Casualty Co.* (2010) 185 Cal.App.4th 954, 968; *Beck v. American Health Group Internat.* (1989) 211 Cal.App.3d 1555, 1561.)

We turn, now, to the Master Agreement.

In the covenants in the Master Agreement, the Developer acknowledged "that the determination of affordable housing cost . . . can be made only at the time of the proposed transfer . . . , taking into consideration interest rates, changes in countywide median income, the terms offered to and the economic circumstances of the proposed purchaser . . . and other factors that cannot be accurately predicted. . . . The Developer further acknowledges that at all times in setting the transfer . . . price the primary objective of the City and this agreement is to provide housing to qualified households at an affordable housing cost[.]" (Emphasis omitted.)

As well, the Developer agreed: "No Affordable Unit may be sold . . . to a prospective purchaser . . . until the City has verified that . . . the prospective purchaser is a Qualified Household, and that the sales price for the Affordable Unit does not exceed the Affordable Housing Cost[.]"

In a section entitled "Selection of Purchasers and Tenants," the Master Agreement provided: "The City shall prepare and make available to [the] Developer any general information that it possesses regarding income limitations and restrictions on Qualified

20

Households applicable to the Affordable Housing and shall provide [the] Developer with an 'application for qualification' form."

The section also provided that after a prospective purchaser submitted an application, including the purchase agreement, "the City shall, within fifteen (15) days after the City's receipt of the completed application . . . confirm that the sale . . . is otherwise in compliance with this Agreement and Resale Restrictions. . . . If the proposed purchaser . . . is approved by the City as provided above, then the Developer may sell . . . the Affordable Unit to the Qualified Household upon the terms and conditions submitted to and approved by the City."

At this stage, the question is whether the Developer can amend its pleading in such a manner that the Master Agreement is reasonably susceptible to the meaning alleged. (*Klein v. Chevron U.S.A., Inc*. (2012) 202 Cal.App.4th 1342, 1384 [as long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, a court must accept as correct a plaintiff's allegations as to the meaning of the agreement].) Because the Master Agreement stated that the City "shall" confirm sale prices, it is reasonable to construe that language as imposing a contractual duty on the City. That construction is reasonable for the additional reason that the Developer had an undeniable interest in selling units after they were built, and it could do so only after the City confirmed that a sale was permissible. Absent such a duty, the City could abstain from confirming sales, which would render the Developer be unable to see its venture to fruition. As a result, we conclude that there is a reasonable probability that the Developer can amend its pleading to state a claim for breach of contract on the theory that the City failed to confirm sale prices.

5. <u>Breach of the implied covenant of good faith and fair dealing</u>.

With regard to the implied covenant of good faith and fair dealing, the City argues that it did nothing to deny the Developer the fruits of its contract. We cannot concur, at least in theory, which is what matters at this juncture. If the City failed to properly verify sale prices, then it may have damaged the Developer by causing it to be sued and incur

21

attorney fees to defend itself.[4]  Therefore, the Developer may have been denied the profits within its contemplation.[5]

> 6.  Impact of the express indemnity clause.

In its letter brief, the City reprises its argument that the express indemnity clause in the Master Agreement bars any liability for the City because the Developer is at least in part responsible for the overcharges.  Because the City's letter adds nothing new on this topic, we need not discuss the issue further.

## II.  The Attorney Fee Award.

As explained in part I, *ante*, we have concluded that the dismissal must be reversed.  By force of this conclusion, the City no longer remains the prevailing party under section 1032, subdivision (a)(4) because it is no longer "a defendant in whose favor a dismissal [was] entered."  Consequently, the City is not entitled to recover its costs of suit under section 1032, subdivision (b) and section 1033.5, subdivision (a)(10)(A).

The award of attorney fees must be reversed.

---

[4]     Our opinion should not be construed in any way as law of the case regarding actual breaches and recoverable damages.  Even if the Developer can successfully amend its pleading, the City will be entitled to litigate the meaning of the Master Agreement and assert affirmative defenses.

[5]     This statement could remain true even if the Developer is forced to disgorge some profits because the sale prices were excessive.  The Developer contemplated profits from sales at proper prices.  It did not contemplate those profits minus the cost of having to defend itself against the homeowners.  The Developer will not be made whole unless it recoups its defense costs.

**DISPOSITION**

We reverse and remand the judgment with instructions for the trial court to allow the Developer to amend its declaratory relief cause of action, and to state causes of action for breach of contract and/or breach of the implied covenant of good faith and fair dealing. We also reverse the award of $37,618.55 in attorney fees. In all other respects, the judgment is affirmed. The Developer is entitled to its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                    ASHMANN-GERST


We concur:


_____, P. J.
            BOREN


_____, J.[*]
            FERNS

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.